UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

DIANE O'NEIL,

Plaintiff,

v.

Civil Action No. 1:20-cv-175-PB

SOMATICS, LLC and ELEKTRIKA, INC.,

Defendant.

---

**DEFENDANT SOMATICS, LLC'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF BENNET OMALU, M.D.**

Defendant Somatics, LLC ("Somatics"), by and through its attorneys, hereby moves *in limine* pursuant to Local Rule 12.1(c) and Rules 702, 402, and 403 of the Federal Rules of Evidence to exclude the testimony of Plaintiff's designated expert witness, Bennet Omalu, M.D., based on the following grounds:

## I. INTRODUCTION

Defendant Somatics, LLC ("Somatics") is a manufacturer and seller of electroconvulsive therapy ("ECT") devices and one of two manufacturers of such devices in the United States. ECT is an accepted and essential psychiatric treatment method for severe Major Depressive Disorder that is resistant to other treatment methods such as psychotherapy and medication.[1]

Plaintiff alleges harm suffered as a result of ECT for her severe and recurrent Major Depressive Disorder with a Thymatron System IV manufactured by Somatics (the "ECT Device")

---

[1] Deposition of Reinhard Viehoff, M.D. ("Viehoff Dep."), attached as **Exhibit A**, at 292:3-7; Randall T. Espinoza and Charles H. Kellner, *Electroconvulsive Therapy*, 386 NEW ENGLAND J. OF MED. 667 (2022), attached as **Exhibit B** ("Espinoza and Kellner"); Amal Joseph Jolly and Shubh Mohan Singh, *Does electroconvulsive therapy cause brain damage: An update*, 62 INDIAN J. OF PSYCHIATRY 339 (2020), attached as **Exhibit C** ("Jolly and Singh").

prescribed and administered by Plaintiff's psychiatrists over a period of several months in 2016 and 2017.[2] Plaintiff Diane O'Neil ("Plaintiff") has a long history of severe, treatment-resistant Major Depressive Disorder associated with cognitive impairment and slowing, memory deficiencies, and suicidal ideation and planning.[3] In or around early August 2016, in the setting of worsening treatment-resistant depression with ongoing suicidality, Dr. David Ledner, M.D., emergently referred Plaintiff to Elliot Hospital in August 2016 for inpatient treatment and ECT consultation with Dr. Reinhard Viehoff, M.D.[4] After this ECT consultation, with Plaintiff's informed consent, Dr. Viehoff prescribed a course of ECT to Plaintiff. Dr. Viehoff and Dr. Jonathan Schwartz, M.D., administered 22 ECT treatments through February 2, 2017, the date of her final ECT.[5]

Plaintiff began receiving psychiatric treatment and taking medication to treat her depression in the early 1990s.[6] She has seen over twenty (20) different psychotherapists in her life.[7] By the early 1990s, she had experienced several extremely traumatic events in her life.[8] Most recently, Plaintiff's husband's death in 2014 led to a severe and acute depressive episode, which contributed to her decision to undergo ECT treatment.[9]

Severe Major Depressive Disorder, of the type suffered by Plaintiff, is associated with cognitive impairments and memory deficiencies, of the type alleged by Plaintiff to have been caused

---

[2] ECF No. 1 (Complaint), at ¶ 60.
[3] Deposition of Diane O'Neil ("O'Neil Dep."), attached as **Exhibit D,** at 138:4-13, 139:4-8, 148:6-12,23, 149:1-9; Deposition of David Ledner ("Ledner Dep."), attached as **Exhibit E**, at 60:9-15, 64:2-7,71:17-24, 170:16-23.
[4] **Ex. E**, Ledner Dep. at 32:19-24, 33:1-3; **Ex. A**, Viehoff Dep. at 81:1-20, 139: 15-18, 142:8-16, 262:14-23, 264:5-12.
[5] **Ex. A**, Viehoff Dep. at 19:17-22, 25:7-9, 26:7-10, 80:1-3, 7-9, 21-24; 81:1-20, 142:8-16, 172:10-21; 8/22/16 ECT Authorization, attached as **Exhibit F**.
[6] **Ex. D**, O'Neil Dep., at 143:1-21; **Ex. E**, Ledner Dep. at 63:8-18.
[7] *Id*.
[8] *Id*.; **Ex. D**, O'Neil Dep., at 79-80, 79-82.
[9] *Id*.

by ECT.[10] The experience of extreme trauma is associated with memory loss, of the type alleged by Plaintiff to have been caused by ECT.[11]

To establish that the ECT Device can, and in fact did, cause Plaintiff's alleged harm, Plaintiff identified Dr. Bennet Omalu, M.D., among others, to opine on the issue of causation. Somatics hereby moves to exclude all testimony from Dr. Omalu because (1) he is not qualified to opine about what happens to the human brain when ECT is administered; (2) his conclusions are not based on reliable principles and methodologies; and (3) his conclusions cannot be "linked through scientifically reliable means to" the issues of general or specific causation in this case. *Wood v. Medtronic Xomed Inc.*, No. 13-CV-090-LM, 2015 WL 2342799, at *4 (D.N.H. May 14, 2015) (quoting *Grimes v. Hoffmann-LaRoche, Inc.*, 907 F. Supp. 33, 35 (D.N.H. 1995)).

## II. BACKGROUND[12]

Dr. Omalu is a forensic pathologist whose research focuses on chronic traumatic encephalopathy caused by impact-traumas in American football. He does not have medical expertise in treating or diagnosing living patients. O2-134:19-20 (I "choose not to treat patients."). Dr. Omalu did not rely on and was unable to cite to epidemiological studies or principles to support his conclusions or theories in this case that modern ECT can cause "brain damage."[13] Ex. K at 28:3-29:15. Further, Dr. Omalu explicitly stated that he did not rely on any

---

[10] **Ex. A**, Viehoff Dep. at 110:16-111:1, 211:14-17; Deposition of Jonathon Schwartz ("Schwartz Dep."), attached as **Exhibit G**, at 218:20-24; Donatella Marazziti, *et al.*, *Cognitive impairment in major depression*, 626 EUROPEAN J. OF PHARMACOLOGY 83 (2010), attached hereto as **Exhibit H** ("Marazziti, *et al.*").

[11] **Ex. A**, Viehoff Dep. at 107:2-5, 110:16-111:1; **Ex. H**, Marazziti, *et al.*

[12] Dr. Omalu's deposition concluded after three days of testimony, and the three transcripts of his testimony—Volumes 1, 2, and 3—are attached hereto as **Exhibits I**, **J**, and **K**, respectively. Dr. Omalu's Expert Report in this case is attached hereto as **Exhibit L** and references thereto will be designated herein as in-line citation "O-R:[page(s)]."

[13] 2 Robert Boland, *et al.*, KAPLAN & SADDOCK'S COMPREHENSIVE TEXTBOOK OF PSYCHIATRY, (10th ed. 2017), attached as **Exhibit M** at 3280-1 (In the distant past (1940s and 1950s) ECT was administered in large, sine wave (continuous) electrical current, and the patient was not given anesthesia or muscle relaxants to prevent convulsive movement of the body. Modern ECT uses ultra-brief pulses of current while the patient is under general anesthesia, given supplemental oxygen, and muscle movement is blocked by medication.)

of the literature he listed under the "References" section that appears at the end of his expert report in this case: "why I put the references was for lawyers like you just to illustrate that these are not imaginary concepts… Is it [relying on medical literature] necessary? No." Ex. I at-115:7-116:3. Rather, according to Dr. Omalu, his conclusions and theories are based on an "amalgamation" of "my training, my education, my experience, and my knowledge," and the "thousands and thousands of books and medical papers" he has read "over the years." Ex. I at-115:14-116:3. Thus, according to Dr. Omalu, he did not reach his conclusions or theories based on a systematic review or analysis of the medical literature, nor did he specifically indicate any medical literature that supports his conclusions or theories.[14]

He has never performed scientific research on ECT. Ex. I at-63:19-23. He has never published a paper on ECT. Ex. I at-64:1-7. He has never submitted or published any review articles on the work of other people on ECT. Ex. I at-64:1-12. Dr. Omalu has never performed an evaluation (either in autopsy or otherwise) of the brains of ECT patients to study the effects (if any) of ECT on brain cells. Ex. I at-69:13-70:7. Dr. Omalu has never examined Plaintiff. Ex. I at-67:6-12.[15]

Dr. Omalu offers two putative causation conclusions in this case. First, according to Dr. Omalu, ECT can cause the harm alleged in this case because ECT can cause "brain damage." Ex. K at 28:3-19. His conclusion seems to be premised on Dr. Omalu's subjective and

---

[14] Dr. Omalu elsewhere stated that he is "relying on assertions" made in Dr. John Read, Ph.D's report that ECT can cause long-lasting amnesia, further clarifying that he did not review the articles cited in Dr. Read's report. *See id*. at 33:13-20; 37:13-17 ("I am relying on [Dr. Read's] assertions."). Dr. Read is the subject of another *Daubert* motion from Somatics.

[15] Dr. Omalu spoke to Plaintiff once, on October 23, 2023, the day before day 2 of his deposition in this case. *See* Ex. J at 133:1-2. This conversation lasted one hour; it was conducted over Zoom; it was not recorded; and Dr. Omalu did not take any notes. Ex. J at 133:11-14. Dr. Omalu is not a treating physician of Plaintiff, and he described the conversation as "socially our discussions [sic] were about symptoms, when they began, when she began to notice them." Ex. J at 134:1-2; Ex. J at 150:6-10. Dr. Omalu testified that this one-hour Zoom conversation "doesn't change my opinion. Just that it does concretize my opinions." Ex. J at 151:14-18.

indefensibly broad definition of "brain damage," which he defines as any "cognitive effect." Ex. K at 28:3-19 ("[C]ognitive effects is brain damage... Cognitive effect is a manifestation of brain damage.").[16] Dr. Omalu was unable to provide any epidemiological study supporting the proposition that ECT as administered to Plaintiff causes brain damage. Ex. K at 28:3-29:15. From this definition, Dr. Omalu concludes that ECT causes "brain damage" because it affects the brain, in this most general sense. Ex. K at 62:17-25 ("It's [ECT] like drugs. So every drug, including ECT, has useful outcomes, therapeutic effects. There are simultaneous…contemporaneous adverse effects. That is a natural, well-established phenomenon of science of every therapy modality.").

In the section of his expert report titled "Does ECT cause brain injury?", Dr. Omalu does not cite to any medical literature. O-R: 7-9. In this section, he states that: "[a]ny factor that… alters the delicate physiological and biomechanical homeostatic milieu of the human brain has a significant potential to cause brain injury and damage, if adequately sustained and persistent." O-R:8. Dr. Omalu does not identify a threshold number of ECT treatments required to produce the claimed damage. *Id*. Instead, he posits without support that: "[t]he amounts of electrical energy introduced to the human brain by ECT machines can be nothing but harmful and dangerous… [they] are in fact expected to [] cause... injuries to human brain cells" O-R:8.[17] For the basis of his theories about the neurophysiological effects of ECT, Dr. Omalu relies on the untested and

---

[16] It is an expected, widely recognized, medically accepted fact that patients undergoing ECT experience short-lived symptoms of confusion and temporary memory loss. *See* Ex. B, Espinoza and Kellner at 670; Ex. A, Viehoff Dep. at 52:17-53:4. It is also recognized, in rare cases, patients complain of longer memory loss. This was explained to Ms. O'Neil as part of the informed consent process. *Id*. at 95:5-21, 107:7-16, 108:5-11, 110:17-24, 111:1, 246:18-24: 247, 249:1-14, 250.

[17] Dr. Omalu seems to hold an unsupported belief that ECT is actually designed and administered to damage the brain. He failed to provide support for such alleged malintent nor medical literature supporting this belief as a plausible theory that ECT *qua* psychiatric treatment functions by inflicting brain injury. Rather, Dr. Omalu's belief seems to follow from his theory of psychiatric treatment in general as "affecting the brain" and thereby causing "brain damage." Ex. K at 62:17-25.

unsupported conclusions of Dr. Kenneth Castleman,[18] an electrical engineer who specializes in computer analysis of images. Ex. I at-61:1-2 ("I will defer to the expert who is handling the physics of ECT [Dr. Castleman].").[19] On the basis of Dr. Castleman's unsupported theories, Dr. Omalu states: "ECT replaced the use of chemicals [unclear] to inflict injury… the primary objective of ECT is to inflict brain injury on the human brain [sic]." Ex. I at-27:21-28:2.[20] Based on Dr. Castleman's theories, Dr. Omalu concludes the 22 treatments of ECT administered by Plaintiff's treating psychiatrists was a "significant and substantial causal contributory factor" to Plaintiff's cognitive impairment. O-R: 12.

In the section of his report titled "What are the mechanisms of brain injury causation by ECT?", Dr. Omalu does not cite to medical literature. O-R:9-10. In this section, he states: "[e]lectrical excitation of the brain initiates" cellular processes involving "abnormal accumulations of abnormal proteins" in the brain that "result in delayed cell death and neurodegeneration." O-R:9 Without any support for this purported causal connection between "excitation" and alleged damage, Dr. Omalu's theory about the "causal mechanism" seems to be drawn by analogy with "other modalities of brain injury [such as] thermal and kinetic energy injuries, and hypoxic-ischemic injury." O-R:10. Without any support for this analogical inference, he posits that "all [such brain injuries] share common pathophysiological pathways in varying degrees" and therefore "electrical injury of the brain possesses multi-modal

[18] Kenneth Castleman, Ph.D., is also the subject of a *Daubert* Motion from Somatics.

[19] Dr. Castleman is an unreliable source on the neurophysiological effects of ECT. At Dr. Castleman's deposition, he was asked about his knowledge of the "anatomy of the head." His answer was as follows:

> I studied anatomy and I reviewed – I reviewed the anatomy of the head, particularly the skull, recently… earlier this week [of February 15, 2022], I think, or last week.

Deposition of Kenneth Castleman ("Castleman Dep."), attached as **Exhibit N**, at 19:17-21. His review of the "anatomy of the head" entailed a review of a "website that teaches an anatomy course, and I went through that." *Id.* at 19:22-20:8.

[20] *But see, e.g.*, Espinoza and Kellner, **Ex. B** ("Electroconvulsive therapy (ECT) has been an essential treatment for severe mood and psychotic disorders for many decades, and its use is supported by evidence of efficacy and safety."); Viehoff Dep., **Ex. A**, at 291: 10-13 (ECT is the "most effective treatment that is available" for major depression.).

pathophysiological cascades, which result in cell damage and death." O-R:10. Because Dr. Omalu does not provide any support for a purported commonality between alleged harm caused by ECT, on the one hand, and the "pathophysiological pathways" of such "thermal and kinetic injuries[] and hypoxic-ischemic injury," on the other hand, it appears that Dr. Omalu simply asserts his conclusion without any valid support. *Id*. Further, Dr. Omalu acknowledges, without support, that "[t]he underlying mechanisms for these abnormal accumulations of abnormal proteins have not been fully elucidated, but chronic neuroinflammation following brain injury has been presented as a mechanism." *Id*. However, aside from Dr. Omalu's own unsupported analogical inference, he does not indicate any basis for his theory that ECT causes such brain injury. *Id*. Nor does he support his contention that ECT results in such "chronic neuroinflammation," as he alleges, is caused by impact-trauma. *Id*.

Further, Dr. Omalu concludes that ECT specifically caused the harm alleged in this case based on a "differential diagnosis" he performed. Ex. I at-87:6-14; O-R:12 ("A history of exposure to repeated ECT treatments is a reliable differential diagnosis evidence for the reasonable determination of causation of brain injury."). The reasoning behind Dr. Omalu's differential diagnosis seems to be as follows: (a) Plaintiff underwent ECT, and then (b) Plaintiff self-reports that her pre-existing cognitive and memory impairments worsened after ECT; therefore, ECT caused the self-reported harm within a "reasonable degree of medical certainty." *Id*; Ex. I at-95:5-6; Ex. I at-112:4-17. Dr. Omalu did not perform a valid differential analysis of competing causes, and he also seems to have ignored Plaintiff's actual pre-ECT condition of Major Depressive Disorder associated with cognitive impairment and slowing and memory deficiencies. *Id*.; Ex. I at-87:6-14 (where Dr. Omalu cites the absence of "vascular dementia and Alzheimer's Disease,

that would be responsible for cognitive impairment," but fails to cite Plaintiff's long record of pre-ECT cognitive impairment associated with Major Depressive Disorder.).[21,22,23]

Dr. Omalu's "differential diagnosis" does not take into account whether ECT is known to cause the effects he attributes to it, aside from chronological correlation:

> Q. Doctor, in order to determine whether or not [Plaintiff] had an aggravation of her cognitive impairment as a result of the ECT, wouldn't you need to know what her cognitive functioning was prior to ECT?
>
> A. No… a patient comes to you, "Sir, after I went to China… I began to notice I am having more episodes of headaches than I used to have," well, that means temporarily there was a …n-o-v-e-l—novel event… **what I am doing here is call differential diagnosis. That was a novel event. She traveled to China, came back. The headaches are worse.**

Ex. I at-112:4-17 (emphasis added). When further asked about the basis for his conclusion, Dr. Omalu stated that he relied on "my training, education, my experience, and my knowledge," without pointing to any specific support for his conclusion. Ex. I at-113:12-15:23.

## III. LEGAL STANDARD

Under Federal Rule of Evidence 702, *Daubert*, and *Daubert*'s progeny, "the district court serves as the gatekeeper for expert testimony by 'ensuring that it both rests on a reliable foundation and is relevant to the task at hand.'" *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 473 (1st Cir. 2016) (hereinafter "*Milward* II") (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)); Fed. R. Evid. 702. Rule 702 and *Daubert* prevent the admission of expert opinions

---

[21] *Supra* fn. 3.

[22] Dr. Omalu never treated Plaintiff nor did he seem to conduct an examination concerning vascular dementia. Ex. I at-67:6-12, Ex. J at 133:11-14. Nor does he indicate that his "ruling out" of vascular dementia was based on any review of a scan of Plaintiff's brain, whether MRI or CT. *See*, *e.g.*, Mayo Clinic, Website, Vascular Dementia Diagnosis, *available at*, https://www.mayoclinic.org/diseases-conditions/vascular-dementia/diagnosis-treatment/drc-20378798 (last visited 11/25/23).

[23] In his report, instead of explaining any differential analysis he actually have performed, Dr. Omalu makes a general statement of his understanding of the general reliability of "differential diagnosis," as he understands this method, without support: "[P]hysicians reasonably rely on the patient's medical, social, family, occupational and injury exposure histories as narrated by the patient, family members, friends and occupational colleagues to perform this differential diagnosis for causation." O-R:12.

"grounded only in the unsupported assertions of the expert." *Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 14 (1st Cir. 2022) (citing *Lopez-Ramirez v. Toledo-Gonzalez*, 32 F.4th 87, 94 (1st Cir. 2022)); *see, e.g.*, *Morse v. Ford Motor Co.*, No. CIV.A08-11930-RGS, 2010 WL 2733607, at *1 (D. Mass. July 9, 2010) (Under Rule 702 and *Daubert*, the district court must ensure "that the fact-finding process does not become distorted by… science that is junky.") (internal citation and quotation omitted). If an expert's testimony is ground only in their unsupported assertions, "'a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Gonzalez-Arroyo*, 54 F.4th at 14 (quoting *Lopez-Ramirez*, 32 F.4th at 94).

"[E]xpert testimony must satisfy three requirements in order to survive a Rule 702 objection: first, the expert must be qualified; second, the expert's testimony must be reliable; and third, it must 'fit' the facts of the case." *Grimes v. Hoffmann-LaRoche, Inc.*, 907 F. Supp. 33, 34 (D.N.H. 1995) (internal citation omitted); *see Wood v. Medtronic Xomed Inc.*, No. 13-CV-090-LM, 2015 WL 2342799, at *4 (D.N.H. May 14, 2015) ("[T]he trial judge must evaluate an expert's proposed testimony for both reliability and relevance prior to admitting it.") (internal citation and quotation omitted). "The party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance." *Milward* II, 820 F.3d at 473 (internal citation omitted).

**a. Dr. Omalu is Not Qualified to Opine about what Happens to the Human Brain when ECT is Administered**

"Rule 702 'mandates that a putative expert be qualified to testify by knowledge, skill, experience, training or education.'" *M & D Cycles, Inc. v. Am. Honda Motor Co.*, No. 22-CV-171-SM-AJ, 2023 WL 7182107, at *4 (D.N.H. Sept. 29, 2023) (quoting *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006)). "The subject of an expert's testimony must be

'scientific ... knowledge.'…the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 589-90 (quoting Fed. R. Evid. 702).

Here, Dr. Omalu has no expertise in ECT or diagnosing living patients. Ex. I at-63:19-23; O2-134:19-20. The basis for his conclusions is only the "thousands and thousands of books and medical papers" he has read "over the years," Ex. I at-115:14-116:3, and he did not rely on the actual literature in his expert report.[24] *Gonzalez-Arroyo*, 54 F.4th at 14 (Rule 702 and *Daubert* prevent the admission of expert opinions "grounded only in the unsupported assertions of the expert.").

Dr. Omalu's putative general causation conclusion—that ECT can cause the harm alleged—is based on the unsupported premise that "cognitive effects is brain damage." Ex. K at 28:3-19. What this means for Dr. Omalu is: (a) any thing (*viz*. any psychiatric intervention at all, "like drugs," Ex. K at 62:19-21), that (b) causes any effect to the brain (however minor and/or impermanent) (c) causes "brain damage." Ex. K at 28:3-19; 58:10-14. This is the type of "subjective belief" that the Rule 702 qualification guards against. *Daubert*, 509 U.S. at 90; *Wood*, 2015 WL 2342799, at *3 (quoting *Grimes*, 907 F.Supp. at 35); *see also Gonzalez-Arroyo*, 54 F.4th at 14. Dr. Omalu does not have relevant expertise in diagnosing living patients and he is therefore unqualified to opine on the basis of differential diagnosis. O2-134:19-20 (Dr. Omalu is forensic pathologist who "choose[s] not to treat patients."); *Daubert*, 509 U.S. at 589-90 ("The subject of

---

[24] In *Thelen v. Somatics, LLC*, Judge Barber excluded Dr. Omalu's putative general causation opinion, finding Dr. Omalu's literature review unreliable. 8:20-cv-01724-TPB-JSS, Dckt. No. 251, at 7-8 (M.D. Fla. Jun. 12, 2023), attached as **Exhibit O**. As in this case, in *Thelan* Dr. Omalu's expert report ended with a "'list of 'References' but Dr, Omalu conceded that he did not rely on the cited literature." *Id*. at 7. Judge Barber further noted:

> When defense counsel in deposition asked Dr. Omalu which of the cited articles support his opinion that ECT causes brain damage,… [h]e deflected questions about the specific content of the article by pointing out, as if to end the discussion, that the article had the word "morbidity" in the title…. Some of the articles were written in foreign languages Dr. Omalu does not know and he admitted as to those articles that he had read only the abstract.

*Id*. at 8.

an expert's testimony must be 'scientific ... knowledge.'…the word 'knowledge' connotes more than subjective belief or unsupported speculation.") (quoting Fed. R. Evid. 702).

**b. <u>Dr. Omalu's Testimony is Not Based on Reliable Principles and Methodologies</u>**

"The requisite review for reliability includes consideration of several factors: the verifiability of the expert's theory or technique, the error rate inherent therein, whether the theory or technique has been published and/or subjected to peer review, and its level of acceptance within the scientific community." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 80-81 (1st Cir. 1998) (citing *Daubert*, 509 U.S. at 593-595). "The *Daubert* Court identified four factors that might assist a trial court in determining the admissibility of an expert's testimony on the issue of reliability":

> (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline."

*Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 14 (1st Cir. 2011) (hereinafter, "*Milward* I") (quoting *United States v. Mooney,* 315 F.3d 54, 62 (1st Cir. 2002)). These factors are non-exclusive, and the trial court possesses broad discretion to determine the admissibility of expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999); *Milward* I, 639 F.3d at 15 ("Expert testimony may be excluded if there is 'too great an analytical gap between the data and the opinion proffered.'") (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *and see Thelan*, 8:20-cv-01724-TPB-JSS, at 7-8 (Dr. Omalu's opinion inadmissible where "most of his opinions are based on his education, training, and experience. But such general references, without more are, insufficient to establish the reliability of specific opinions.").

Here, Dr. Omalu's putative causation conclusions fail to satisfy the four *Daubert* factors: Dr. Omalu has performed no scientific study on ECT and can cite to no such study on ECT performed by others.

*Milward* I, 639 F.3d at 14. Dr. Omalu's theories have never been tested, even by Dr. Omalu himself. *See id.* There is no calculation of an error analysis, because there has been no testing performed by him or others that document the hypothesized "damage." *See id.* There is no peer review published investigation or study that has looked at Dr. Omalu's opinions. *See id.* There is no evidence of acceptance of Dr. Omalu's opinions about ECT within any relevant medical community. *See id.*

**i. Dr. Omalu's "Differential Diagnosis" is an Unreliable Methodology**

Specific causation is typically established by expert testimony employing a technique known as "differential diagnosis." *See, e.g.*, *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, n. 7 (11th Cir. 2010) ("The 'differential diagnosis' methodology is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated.") (internal citation and quotation omitted). Differential diagnosis is a process of reasoning to the best explanation. *Milward* I, 639 F.3d at 18; *see also Kilpatrick.*, 613 F.3d at 1342 ( It involves "a process of compiling, or ruling in, a comprehensive list of possible causes that are generally capable of causing the [injury at issue], and then systematically and scientifically ruling out specific causes until a final, suspected cause remains.") (internal citation omitted).

The First Circuit views the reliability of differential diagnosis as presumptively suspect. *See Gonzalez-Arroyo*, 54 F.4th at 17 (citing *Milward* II, 820 F.3d at 476). While "'differential diagnosis' can be a reliable of medical diagnosis… [the plaintiff] still must show that the steps taken as part of that analysis—the 'ruling out' and the 'ruling in' of causes—were accomplished utilizing scientifically valid methods." *Milward* II, 820 F.3d at 476; *Grimes*, 907 F. Supp. at 38 ("Since [the plaintiff's expert] opinion on specific causation is necessarily based on his opinion concerning general causation, that testimony must be excluded as well."); *and see Thelan*, 8:20-cv-01724-TPB-JSS, at 7-8.

Here, because Dr. Omalu relies on a differential diagnosis methodology, for his testimony to be admissible, it must satisfy the following two prongs (a) he must establish general causation by "scientifically valid methods," *Gonzalez-Arroyo*, 54 F.4th at 17, and (b) he must conduct a valid scientifically based differential analysis of the relevant competing causes to conduct the valid "ruling out." *See Milward* II, 820 F.3d at 476; *Thelen*, 8:20-cv-01724-TPB-JSS, at 7-8. Dr. Omalu's putative general causation conclusion is the unsupported and irrelevant proposition that ECT can "affect" the brain, Ex. K at 28:3-29:15; 62:17-25, based only on his "education, training, and experience." Ex. I at-62:17-25. Dr. Omalu's putative conclusion is facially unreliable because it is not supported by a systematic review of medical literature, let alone a single specific review of any literature that supports his proposition that ECT can cause "brain damage," however defined. *See Milward* II, 820 F.3d at 476; *Grimes*, 907 F. Supp. at 38; *and see Thelen*, 8:20-cv-01724-TPB-JSS, at 7-8 (Dr. Omalu's putative causation opinion inadmissible where "most of his opinions are based on his education, training, and experience. But such general references, without more are, insufficient to establish the reliability of specific opinions.").

While Dr. Omalu's differential diagnosis is inadmissible in the first instance, assuming *arguendo* that Dr. Omalu establishes general causation based on "scientifically reliable methods," his differential diagnosis is still clearly inadmissible. This is because Dr. Omalu fails to scientifically evaluate the most probable alternative cause: Plaintiff's underlying recurrent and severe Major Depressive Disorder associated with cognitive impairment and slowing and memory deficiencies:[25]

[25] *Supra* fn. 3; *see also, e.g.* **Ex. H**, Marazziti, *et al.*, ("The majority of depressed patients report decreased speed of thought… slowed thinking is central to the depressive state;" and Major depression can affect the ability to think, concentrate, make decisions, formulate ideas, and remember.).

> Q. Doctor, in order to determine whether or not she had an aggravation of her cognitive impairment as a result of the ECT, wouldn't you need to know what her cognitive functioning was prior to ECT?
>
> A. No.

Ex. I at-112:4-17. ("What I am doing here is differential diagnosis. That was a novel event. She traveled to China, came back. The headaches got words."); *then see Gonzalez-Arroyo*, 54 F.4th at 17 ("[O]ur case law explicitly rejects the inherent reliability of a differential diagnosis."). Insofar as Dr. Omalu does consider comorbidities, his analysis is invalid, in that he virtually ignores the entirety of Plaintiff's history with cognitive impairment and seemingly rules out by fiat "vascular dementia and Alzheimer's Disease" as the only relevant comorbidities. Ex. I at-87:6-14 (Dr. Omalu cites the absence of pre-ECT "vascular dementia and Alzheimer's Disease, that would be responsible for cognitive impairment").[26] Nor is this "methodology" at all based on his experience in medicine or science as a forensic pathologist who "choose[s] not to treat patients." O2-134:19-20; *Gonzalez-Arroyo*, 54 F.4th at 17; *Ruggiero*, 424 F.3d at 254 (Differential diagnosis is a "process whereby medical doctors experienced in diagnostic techniques provide testimony countering other possible causes ... of the injuries at issue") (cited favorably in *Milward* II, 820 F.3d at 476) (citation and quotation omitted).

**c. Dr. Omalu's Conclusions Fail to Meet the *Daubert* "Fit Requirement"**

"The relevancy requirement 'seeks to ensure that there is an adequate fit between the expert's methods and his conclusions.'" *Wood*, 2015 WL 2342799, at *3 (quoting *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 32 (1st Cir. 2012). "This 'fit requirement refers to the necessity of a connection between the expert's testimony and the facts of the case.'" *Id.* (quoting *Grimes*, 907

[26] Dr. Omalu never treated Plaintiff and therefore never conducted any examination as to whether she may have vascular dementia. Ex. I at-67:6-12, Ex. J at 133:11-14. Nor does he indicate that his "ruling out" was based on a review of a scan of Plaintiff's brain, whether MRI or CT. *See, e.g.*, Mayo Clinic, Website, Vascular Dementia Diagnosis, *available at*, https://www.mayoclinic.org/diseases-conditions/vascular-dementia/diagnosis-treatment/drc-20378798 (last visited 11/25/23).

F.Supp. at 35). 'Thus, the results of a scientifically reliable experiment or study will fail *Daubert*'s fit requirement and be excluded unless the results can be linked through scientifically reliable means to the expert opinion it purports to support.' *Id.*

Here, Dr. Omalu's testimony is inadmissible because it is not relevant to the issue of causation in this case. *See Grimes*, 907 F. Supp. at 34 ("[E]xpert testimony must… 'fit' the facts of the case."). Dr. Omalu's conclusion that ECT can "affect" the brain—which is true of every psychiatric intervention, including psychotherapy or medication, or of caffeine for that matter—is not probative of general causation. Ex. K at 62:17-25; *then see Wood*, 2015 WL 2342799, at *3. Stated differently, the question of general causation in this case is: does ECT have "the capacity to cause the condition from which the plaintiff suffers." *Short v. Amerada Hess Corp.*, No. 16-CV-204-JL, 2019 WL 1430106, at *14 (D.N.H. Mar. 29, 2019) (emphasis added). Whether ECT can cause any effect at all is not probative of this. Ex. K at 62:17-25 ("It's [ECT] like drugs. So every drug, including ECT, has… therapeutic effects. There are [also] adverse effects. That is a natural, well-established phenomenon of science of every therapy modality."). And insofar as Dr. Omalu's conclusion is taken to support causation, it would have a high likelihood of confusing the jury based on the highly probable impact on the jury of a medical doctor's unsupported assertion that "cognitive effects is brain damage." *See* Fed. R. Evid. 403; *See* O3:28:3-19.

## IV. CONCLUSION

For the foregoing reasons, Somatics respectfully requests this Court enter an order excluding the testimony of Plaintiff's designated expert witness, Bennet Omalu, M.D.

**SOMATICS, LLC**

/s/ Susan J. Cole
Susan J. Cole, Esq., B.C.S. (*pro hac vice*)
Joseph T. Prive
MG+M The Law Firm
701 Brickell Avenue, Suite 2000
Miami, FL 33131
Tel: (305) 537-3410
Fax: (305) 537-3411
scole@mgmlaw.com
*Counsel for Defendant Somatics, LLC*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the United States District Court for the District of New Hampshire by filing through the CM/ECF system, which served a copy of the foregoing upon all counsel of record on November 30, 2023:

*/s/ Jason A. Benkner*
Jason A. Benkner