UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Case No.: 1:20-cv-00175-PB

- - - - - - - - - - - - - - - - - - -X
DIANE O'NEIL, :
Plaintiff :
:
VS :
:
SOMATICS, LLC and ELEKTRIKA, INC., :
Defendants :
- - - - - - - - - - - - - - - - - - -X

Videotaped deposition of
REINHARD P. VIEHOFF, M.D.
taken via videoconference before Clifford Edwards, Certified Shorthand Reporter and Notary Public, on November 10, 2021, at 10:08 a.m. EST.

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

that the court needs to grant the petition for guardianship.

BY MS. ALARCON:

Q Right.

A Step two is that the court then hears the petition regarding electroconvulsive therapy.

It is not that the patient is not in agreement with the treatment, but that they are not capable of making an informed decision regarding healthcare process.

Q Okay. And in the second step, once the court hears the petition for ECT, at some point does the court either grant or deny the petition?

A Correct.

Q Okay. And if the court grants it, ECT is ordered?

A Then we may commence with ECT. However -- in most instances, we do, but there -- you know, there -- there was an occasion where the legal agent or the -- the appointed guardian decided against continuing with the plan of care for ECT. That is not the usual.

Q How many times would you say that's happened?

at this. We've -- we've been able to make out Dr. Ledner's notes. So that -- I think that's pretty impressive.

A Yeah.

Q Okay. Fair enough, Doctor.

So --

A It's basic -- basically, what it is, is the procedure notes for the ECT. So I -- I was -- I provided 5 of the 22 treatments, and I just jotted down the percent energy, the settings on the instrument.

That -- and those -- that data is actually available. It's the same data that's available in the records that were provided to me by Attorney Forey.

Q Okay. That's fair enough.

Doctor, you said you did 5 -- you performed 5 to -- 5 out of the 22 treatments, but after reviewing your records, do you -- do you recall you did the first three?

Does that sound right?

A Correct.

Q Okay. And you did not do any of the last few treatments; right?

That was Dr. Schwartz?
A Exactly. I -- I would have to look at the records, but I think that the last treatment I did may have been the -- the seventh treatment.
Q Okay.
A I'm not absolutely certain of that.
But Dr. Schwartz and I worked together, and I did the inpatient work. So that's where we started. And then he did a bulk of the outpatient treatments.
Q Okay. And, Doctor, we've been using the word "ECT."
Just for the record, do you -- we're on the same page that "ECT" means electroconvulsive shock therapy; is that correct?
MR. VIENS: Objection.
A Electroconvulsive therapy.
BY MS. ALARCON:
Q Okay. Electroconvulsive therapy, otherwise known as ECT; right?
A Correct.
Q Okay. Do you have an understanding of whether Ms. O'Neil had bilateral or unilateral ECT treatment?

The right unilateral treatment may be effective. However, in some instances not -- not as effective. There are fewer cognitive side effects associated with right unilateral.

The bitemporal treatment may be more effective, works more rapidly, and may have more cognitive side effects associated with it.

Q Why -- why is it that there's a different treatment effect between unilateral and -- and bilateral?

A I --

MR. VIENS: Objection.

A I'm uncertain --

BY MS. ALARCON:

Q Okay.

A -- as to why.

Q And when -- when you speak with patients about the efficacy or resulting side effects of -- of one type of treatment or the other, and specifically when you're talking about cognitive effects, do you expect those cognitive effects to be, you know, temporary and surrounding the -- the time of treatment?

MR. VIENS: Objection to form.

A The -- that -- that would be the usual. If -- if someone were to experience cognitive effects, it would be around the -- around the time of the treatment over a period of weeks to months.

BY MS. ALARCON:

Q Okay. And you would expect that after weeks or months, those side effects would -- would go away?

A Generally.

MR. VIENS: Objection.

BY MS. ALARCON:

Q Doctor, have you reviewed the instruction manual for the Thymatron System IV?

MR. VIENS: Objection.

A In the remote past. Not recently.

BY MS. ALARCON:

Q Would that have been -- do you recall if at some point, at your time at Elliot Hospital, the hospital ever retained a new device?

A Yes.

Q Was that around 2005?

MR. VIENS: Objection.

A I'm -- that -- that may be correct.

MS. ALARCON: But for the record, this is document Bates-stamped 97 -- DIAN0097 to 100.

BY MS. ALARCON:

Q I'm looking at the very bottom of -- of page 97 here.

And do you see, Doctor, where it says "Consult Note by Reinhard Viehoff...8/22/16"?

A Sure. Yeah.

Q Okay. Did you review this progress -- this consult note before today?

A I did.

Q Okay. I'm going to scroll down --

MR. VIENS: Did he say he did? He did or didn't? I'm sorry.

THE WITNESS: I did.

MR. VIENS: Okay. Thank you. I'm sorry.

THE WITNESS: No. That's all right.

BY MS. ALARCON:

Q Okay. And looks like you -- you did a history and present illness summary of -- of Ms. O'Neil; is that correct?

A Correct.

Q Okay. Doctor, can you explain what had occurred up until this point, August 22nd, that you then provided a psychiatric consult for Ms. O'Neil?

MR. VIENS: Objection.

A She had been admitted to the adult behavioral health unit at the Elliot Hospital, and she was having severe symptoms of depression which were not effectively treated by medication. She had recently been admitted to the behavioral health unit in Nashua with suicidal ideation. Dr. Ledner is -- or was her outpatient psychiatrist.

And given the lack of response from the various treatment efforts with stabilizing medication and support and psychotherapy, all of which had been in-- unsuccessful, she was then referred for electroconvulsive therapy.

And Dr. Ramirez, who was the admitting physician on the behavioral health unit at the Elliot, requested my consult as I was the ECT practitioner.

BY MS. ALARCON:

Q Okay. And at some point, did you speak with Dr. Ramirez about Ms. O'Neil or -- and -- and, I guess, up until August 22nd, 2016?

practitioner.

Q And in Ms. O'Neil's case, that was Dr. Ledner?

A Correct.

Q When you were describing your -- your general discussion about ECT when consenting a patient, you used the word "generally," that -- that generally cognitive side effects would decrease over time.

What do you mean by "generally," Doctor?

MR. VIENS: Objection.

A In -- in most instances.

BY MS. ALARCON:

Q Okay. And if a patient asked you to quantify that, do you give an example?

MR. VIENS: Objection.

A I -- I've given some examples of people, like, a patient who had some permanent loss of memory regarding certain events that was significant in their life and -- such as took a trip to Hawaii, but didn't recall having taken the trip.

BY MS. ALARCON:

Q And in that particular patient, that trip to Hawaii, was that around the time of their

ECT.

Regardless of whether -- patients who have not had ECT at all can have permanent loss of memory due to extensive trauma that they've experienced.

BY MS. ALARCON:

Q Okay. So -- so when you are consenting a patient to ECT, generally, do you -- do you tell patients you might suffer a permanent loss of memory from ECT of events that have occurred, you know, years prior to ECT?

MR. VIENS: Objection.

A I would give an example. As I said, you know, I would give the example of the patient I knew who had the trip to Hawaii and didn't recall that, as an example of what could happen.

BY MS. ALARCON:

Q But that -- that trip to Hawaii, how -- I'm trying to understand that example you give -- is that near the time of ECT treatment? Is that around the time of ECT treatment, years before, years after?

A Once again, I -- I can't answer the question.

Reinhard P. Viehoff, M.D.

Q Okay. So -- so when you give --
A And I don't know the -- the details of when she took the trip versus when she -- when she had the treatments.
Q So you explain that there may be some gaps -- permanent -- or -- or some spotty gaps in memory around the time of treatment? You tell that to patients; right?
MR. VIENS: Objection.
A Or there -- there could be some memory deficits that could persist.
BY MS. ALARCON:
Q Okay.
A But that is not usual.
Q Okay. And then -- so the patient might expect that around the time of the treatment based on what you've told them?
MR. VIENS: Objection to form.
Misstates. Asked and answered.
A The general -- I -- I describe the general process as -- I think I've -- I'm -- I'm sorry. I'm -- I'm trying to answer your question. I -- I think I have answered your question.

MR. VIENS: Objection.

A I would mention stroke, and I would mention cognitive deficits. I would mention prolonged seizures.

BY MS. ALARCON:

Q Okay. You would mention stroke? Is that what you said?

A Yeah. Stroke would be a form of brain damage.

Q Okay. So you say there's a risk of having a stroke?

A Of course, yes.

Q And there's a risk of a prolonged seizure?

A Of course, yes.

Q That's what you say?

And -- and -- and cognitive side effects, but you've -- you've described that those side effects, you don't expect them to be permanent; right?

MR. VIENS: Objection. Asked and --

A I did -- I would give an example of someone -- I think we've already gone over this, but, yes, somebody may have a permanent gap in

memory for certain events --
BY MS. ALARCON:
Q Okay. But again --
A -- as an -- as an example.
Q Okay. All right.
A It's not -- it's not common in my experience. So --
Q Okay.
A -- of -- of the thousands of treatments that I've done and the -- the -- I've had one patient with that example.
Q Okay. Doctor, I'm going to show you what we'll mark as Exhibit 5 -- 6.
(Whereupon, Exhibit No. 6, Electroconvulsive Therapy (ECT) Authorization, Bates Nos. DIAN00024 and DIAN00025, was marked for identification.)
MR. VIENS: I think it's 6. Let me confirm.
Yeah. I think it's 6.
MS. ALARCON: Yeah. And for the record, this is DIAN, D-I-A-N, 0024 to 25.

A I don't have that.
Q If a patient asked you to pull up that study and -- and provide it to them, would you be able to do that?
A A double-blind, placebo-controlled sham trial?
Q Yeah.
A I would -- I would -- I would probably reach out to my colleagues through the ISEN, which is why we have this kind of international society. So if there's some questions specifically or studies that -- that references these -- these things that, you know, if I'm not aware of it, there -- there most certainly is some colleagues who are -- either in this country or in -- in other countries, who would have that awareness, which is why we have this thread of communication through the e-mail.
Q Okay. Doctor, you -- you said, when talking about the brain being stimulated, you -- it most likely -- most likely you said has a multifactorial system of the --
A Which -- which would account --
Q -- of the treatment; right?
A Because it works so rapidly. So

So we would want to do whatever we can to try to help the person to relieve their suffering and improve their quality of life, understanding that there are potential risks associated with the treatment, but there are also potential benefits.

And the greatest risk, of course, would be the desperation of somebody taking their own life.

BY MS. ALARCON:

Q Doctor, was Diane O'Neil catatonic when you consulted with her for ECT?

A No.

Q Was she in a psychotic state?

A She was not psychotic.

Q She was suffering from severe depression; right?

A Severe treatment-resistant depression. That was the diagnosis --

Q Okay. And --

A -- on her.

MR. VIENS: What was the last part? I'm sorry. I just --

A Treatment-resistant depression was her admitting diagnosis --

BY MS. ALARCON:
Q You're not sure?
A No.
Q And you didn't know that when you consulted Ms. O'Neil -- with Ms. O'Neil regarding ECT?
MR. VIENS: Objection.
A I -- I was given this referral because she was -- and I explained this already -- that she was at Southern New Hampshire Medical Center, their behavioral health unit. She was suicidal. Then she was referred to our unit with treatment-resistant depression.
So she has a history of symptoms, and she has a history of treatment, and that treatment had failed.
BY MS. ALARCON:
Q Okay. And you say she was suicidal.
She -- she did not actually have any suicide attempt at that time; right?
MR. VIENS: Objection.
A Not that I'm aware of.
MS. ALARCON: Okay. That's all I have for now. I'm sure I will have more

regarding concerns, and then I would leave it up to them to kind of move forward from there with -- with that.

Q Okay. The -- but you do recall at some point after you joined -- joined Generations and was -- and was performing ECT there, they got a new, at the hospital, Thymatron device?

MS. ALARCON: Objection.

A Yes. The --

MS. ALARCON: Foundation.

A This System IV, yeah.

BY MR. VIENS:

Q And do you recall if that was, you know, right when you had joined or a couple years into your time at --

A I think --

Q -- at --

A I think it might have been a few years into my involvement there.

Q Okay. When you had joined Generations and -- and began doing ECT work there, do you recall if you -- if you reviewed any manuals -- instruction manuals for the device at the time?

A I think when we first received the

late 1990s.

Q Okay. Well, with patients -- psychiatric patients who have, you know, a long history of -- of psychiatric issues and who have never had ECT, is it common for patients like that to have cognitive impairments due to their underlying issues?

A It --

MS. ALARCON: Objection. It lacks foundation. Calls for speculation. And it's an incomplete hypothetical.

A It would --

BY MR. VIENS:

Q You can answer.

A -- not -- it would not be unusual for somebody with severe psychiatric symptoms to have cognitive impairment. That -- that actually would be more -- more the case with schizophrenia.

Q Okay. Or -- you know, same question, but for, you know, memory issues, is -- is the folks who have severe depression or severe psychiatric illness who have never -- never had ECT, is -- is memory problem a -- a common problem that those -- those patients have reported to you over the years?

MS. ALARCON: Objection. It's an

A Correct.
Q And you expressed to her, you know, the bitemporal is more rapid, but may have more cognitive side effects than the right unilateral; is that correct?
A Right.
Q Okay.
A Correct.
Q And after that discussion, she was agreeable to proceeding with the bitemporal ECT, knowing that?
A Correct.
Q Okay. And if a -- if -- if she had told you that, you know, I would prefer to go forward with the right unilateral because I'm concerned about, you know, more side effects, then would you have gone on with that direction from the patient?
MS. ALARCON: Objection. Calls for speculation.
A No. I -- yes, definitely, I -- I would -- this -- this is all part of the process of my communication with the patient. I'm giving them options. I'm giving them information. I -- you know, I said, This is your choice. What would you

prefer?

So I've actually had that conversation with patients many times, you know.

And if they say, No, thanks. I don't really want to do bitemporal. I'm concerned about the cognitive effects. I -- I think I'll go with the right unilateral.

I say, Okay. Let's do that.

BY MR. VIENS:

Q Doctor, I want to look at the -- oh, before I do that, let me -- let me backtrack.

You -- you talked about the -- the -- some of the examples that you typically give patients about cognitive and memory impairments that might occur from ECT.

Do you recall that testimony earlier?

A Of course.

Q Okay. The patient with the -- that -- that you mentioned who had, you know, a loss of a memory about a vacation to Hawaii --

A Yes.

Q -- do you recall approximately when that -- when you had that patient?

Was that prior to Ms. -- having

memory associated with the treatment.

But she was able to relearn the information.

Q Okay. And -- and those sorts of examples and those sorts of cognitive and -- and memory impairments are -- are the sort of things that you discuss with your patients prior to, you know, moving forward with ECT; is that correct?

A Of course. Of course.

Q Okay. And although you -- you don't have a specific memory of exactly the words that you shared with Ms. O'Neil, you would have expressed those same sorts of potential side effects to -- to her; is that correct?

MS. ALARCON: Objection. Calls for speculation.

A I -- you know, I've done this countless number of times, and -- and I have a certain approach that I take, and -- and so I just reproduce that approach. If I have additional information that I gather along the way which is relevant to informing the patient, I will provide that as well.

So it's not to say that I -- I certainly don't do, in terms of my practice, the same thing

that I did 24 years ago. That -- that would be problematic. So I -- I modify as I -- as I go along, as I gather more information, more experience, and I may supplement and adjust what it is that I provide.

But there's this basic core of information when I'm asked to do a consult and inform people about ECT that I will provide and -- and that, you know, these are some of the things that I am offering as examples.

What -- you know, what I specifically said and how I said that to Diane O'Neil, the only way that would be recorded would be through a -- a video, which --

BY MR. VIENS:

Q So you --

A -- doesn't exist.

Q Doctor, so your custom and practice as of August of 2016, when doing the informed consent process with the patient, was to express some of the -- the side effects and risks that you've -- you've mentioned by way of these examples you provided; is that correct?

A Of course.

Q Okay. Have you had patients that you've treated with ECT over the years that have expressed to you, after ECT, that they felt that they had an impaired ability to process new information after ECT?

A No.

Q Okay. Ms. O'Neil -- well, strike that.

I asked you earlier about the -- some of the different types of patients that receive ECT, a diagnosis -- diagnoses that patients have that undergo ECT.

Do you remember that?

A Yes.

Q Was Ms. -- Ms. O'Neil was a patient that had major depressive disorder, a severe episode of that, with treatment resisting -- resistant -- you know, previously resistant treatment to -- to medication?

MS. ALARCON: Objection. It's been asked and answered.

A Treat- -- treatment-resistant depression, major depressive disorder, recurrent severe, without psychotic features.

provide; is that correct?

A That --

MS. ALARCON: Objection. Misstates the evidence.

A Medication was not effectively treating her condition.

BY MR. VIENS:

Q Okay.

A She had been suicidal with the admission to Southern New Hampshire Medical Center. The -- the treatment provided was ineffective, which resulted in her referral to our unit for ECT.

Q And, Doctor, you indicated, during a break you looked at and confirmed that you had done the 17th ECT treatment for Ms. O'Neil.

Do you remember that?

A That -- that was the -- the last of her treatments that -- that I was involved with.

Q And that was -- do you recall the date being in November -- that was in November of 2016 or do you have a recollection as to when that was?

A I -- I don't recall the date. I -- I just know it was treatment number 17.

Q Okay. The --

of -- of Ms. O'Neil as a person, other than -- you're looking at the records, but, you know, as we sit here and we've been talking today and -- do you have in your mind a -- a picture of her or a memory of her?

MS. ALARCON: Objection. It's vague.

A No, I -- I do not.

BY MR. VIENS:

Q So, Doctor, do you -- do you consider ECT a useful tool in treating major depression?

A It is the most effective treatment that is available.

Q Okay. And do you consider ECT -- well, strike that.

Do you consider it to be an effective tool in treating major depression?

A Absolutely.

Q Okay. And do you agree that the psychiatric community accepts ECT as an effective tool in treating major depression?

A Not all psychiatrists would. I -- I think that's a -- unfortunate that my colleagues do not fully understand and appreciate the value of

ECT.

Q Okay. Is it generally -- although there may be some that have different views, is it generally -- is it generally accepted by the -- the psychiatric community that ECT is -- is an effective tool to treat major depression?

A Of course. Of course.

MS. ALARCON: Lacks foundation. Calls for speculation.

David, do you want to pass to me, and you can --

MR. VIENS: Yeah.

MS. ALARCON: -- look at your notes?

MR. VIENS: Yeah. Yeah. Why don't we do that. I think -- let me just take one -- one -- one last look here before I pass the torch over.

BY MR. VIENS:

Q Doctor, is there anything that you can think of that Somatics could have told you about ECT that you didn't already know or that you have obtained from the -- you know, your research and review of literature and attending conferences and speaking with colleagues and, you know, the clinical

C E R T I F I C A T E

I, Clifford Edwards, Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, the witness was duly remotely sworn to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony, that said deposition was taken by me stenographically at the time and date hereinbefore set forth, and the foregoing is a true and accurate transcript of the testimony.

I FURTHER CERTIFY that I am neither of counsel nor attorney to any of the parties to said suit, nor am I an employee of any party to said suit, nor of any counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 28th day of November, 2021.

______________________________

Clifford Edwards
Notary Public

My commission expires: 9/30/2026