DIANE O'NEIL

vs

SOMATICS

Docket No. 1:20-cv-00175-PB

BENNET OMALU

April 18, 2023

AVICORE REPORTING

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

primary focus of any paper I have published.

Q. (By Mr. Viens) All right. So you can't recall any such publication, as you sit here today; is that correct, Doctor?

A. Sir, it's not about recalling. I have stated as a matter of fact that I have not published any paper primarily focused on ECT; that ECT is not my academic interest. I, as a doctor, need to select areas you want to study for the -- or make your academic interest. It does not mean you are not an expert in the field.

Q. Doctor, so in this case, and I understand in the other cases you are involved in in litigation alleging injury from ECT, you have opined that ECT causes brain injury; is that correct?

A. Sir, I have not opined. It is a matter of fact.

Q. Okay.

A. It is a generally-accepted principle of medicine and science that ECT, which introduces electricity to human brains, causes seizures. ECT replaced the use of chemicals to inflict brain injury. So if the primary objective of ECT is to

inflict brain injury on the human brain, brain injury is brain damage.

Q. Okay.

A. Because the human brain is post- -- post-mitotic. The human brain is the only --

(Reporter clarification.)

A. Sorry. It's post-mitotic. Post, p-o-s-t, then hyphen m-i-t-o-t-i-c. Post-mitotic. Sorry.

Q (By Mr. Viens) And, Doctor, if you can just try to focus on the specific question I ask --

MR. ESFANDIARI: David, he was not finished answering your question.

Continue, Dr. Omalu.

Q. (By Mr. Viens) You were still -- you were still going, Doctor?

MR. ESFANDIARI: Yes.

A. Yes.

MR. ESFANDIARI: He stopped to correct the court reporter.

Continue, Doctor.

A. So --

MR. VIENS: You will have a chance to ask questions, Bijan. And we'll give you --

A. Such absolute questions, I will defer to the expert who is handling the physics of ECT.

Q. Okay. And who is that? Is that Dr. Castleman?

A. What was his name again? Doctor --

THE WITNESS: Could you remind me, please, Attorney Bijan?

MR. ESFANDIARI: Dr. Castleman.

THE WITNESS: Dr. Castleman, yes.

Q. (By Mr. Viens) So you rely on Dr. Castleman for any foundations concerning the amount of electricity that reaches the brain during ECT; is that correct?

A. Yes.

MR. ESFANDIARI: Objection to the form of the question. Misstates testimony. Dr. Castleman is testifying concerning the amount of electricity that is being generated by the machine.

MR. VIENS: Please just limit the objections.

MR. ESFANDIARI: Enough electricity is reaching the brain that induces a seizure.

MR. VIENS: Yeah. Just please leave the object -- no speaking instructions, please, Bijan.

Q. (By Mr. Viens) But, Doctor, I think you answered yes? You are relying on Dr. Castleman for foundation as to the amount of electricity that reaches the brain during ECT; is that correct?

A. No, no, no. I don't need such piece of information to formulate my opinions. I read his report. Based on my training, education, and expertise, ECT is administered to a human being. Okay? And there is a seizure, with or without anesthesia. That indicates physiologically significant amounts of electrical energy reached the brain.

Q. Okay. But do you know how much electricity actually reaches the brain to induce a seizure during ECT?

A. Could you repeat the question again? Sorry.

Q. Do you know how much electricity actually reaches the brain in order to cause a seizure with ECT?

A. How much is irrelevant, sir, as long as the outcome is a seizure. That means there's been brain injury. The amount or -- the amount doesn't really matter. What matters is the amount was insufficient to induce a seizure. A seizure simply means abnormal electrical activity of the brain.

Q. Okay.

A. So if ECT induces abnormal electrical activity of the brain through introduction of electricity, no matter how much is introduced, it is physiologically and forensically significant.

Q. Okay. But are you able to say, Doctor, how much electricity actually reaches the brain during an ECT treatment?

MR. ESFANDIARI: Objection. Asked and answered.

A. I will defer to the expert who is designated to address such issues.

Q. (By Mr. Viens) Doctor, have you performed any scientific research specifically concerning ECT?

MR. ESFANDIARI: Objection to the form of the question. Vague.

A. No. Not ECT as a primary interest, no.

Q. (By Mr. Viens) Okay. And have you ever performed any scientific studies that reviewed the work of others concerning ECT?

A. You know, sir, when we began this, you asked me a question have I published on ECT. I said no. So this questions you are now asking me again is repeating what we have already answered. I said, no, I have not published a paper whereby ECT was the primary focus of the paper. And I added my published work is less than 0.01 percent of the work I have done in my life. I don't publish everything I do.

Q. Have you ever recommended ECT to any patients that you have treated during your career?

A. Sir, I thought I had told you that I am a pathologist. I don't treat patients. So if I don't treat patients, will I recommend any form of therapy to offer any patient? No.

Q. Well, I think -- I thought you testified earlier you practiced as a general practitioner for about five years in Nigeria and in an emergency, Doctor; is that right?

A. Yes, sir.

it.

Doctor, this report is dated March 4, 2022. Have you developed any new opinions that are not expressed in this report in this matter?

A. No, sir.

Q. Okay. Did you examine Ms. O'Neil when -- in preparation for making this report?

A. I don't recall. No.

Q. Would you typically -- well, strike that.

You don't recall -- do you recall if you have ever spoken directly to Ms. O'Neil?

A. I don't recall.

Q. The report lists a number of materials that it says you reviewed in preparing the report. There are 16 items on page 3. My question is, do you know if you have reviewed any other materials in this case since you made your report that aren't listed here?

A. Of course, sir, yes, I have. There are hundreds of papers, which I cannot list in every -- books. So what I do, this list of references is just to indicate that -- to give examples of published literature on the topic. This is not

A. Yes, sir.

Q. My question is have you -- do you know if you have received any other medical records of Ms. O'Neil in this matter since you prepared your report that aren't listed here?

A. I honestly don't recall.

Q. Did you receive copies of expert reports prepared by Somatics' experts in this case? There's a Dr. Coffey, Dr. Kelner, and a Dr. Builder. Do you know if you have received any of those reports?

A. I am not sure; so I don't recall. I don't know. I cannot answer that at this moment.

Q. Okay. On your report, Doctor, in the introductory area, you mention that you have conducted and performed over 10,000 autopsies and death investigations and over 13,000 brain tissue specimens. You have examined over 13,000 brain tissue specimens. Is that approximately correct?

A. Yeah. That's a very conservative estimate, yeah. It's much higher than that. But that's conservative; but, yes, sir.

Q. During any of the autopsies you performed or brain tissue specimens you reviewed, did any of

those instances ever involve any assessment of impact on the brain by ECT?

A. I cannot do -- assess impact of ECT because it's outside the normal practice. I would need to get the patient consent for that. I would need to perform some specialized analysis. So I have not done that. I cannot do that, no.

Q. Have you worked with other law firms besides the law firm you are working with in this matter concerning litigation involving injury being claimed from ECT?

A. I don't know. I don't keep -- I don't memorize or keep records of types of cases I do. I believe it's unethical. So I cannot answer that. I don't know.

Q. The brief summary of medical records in your report, did you prepare that, starting on page 3?

A. I -- I don't know. But beginning this year, January of this year, I have a panel of two other doctors who summarize medical records for me. And prior to that, there was this other pathologist who helped me every night and day when she has time.

that's supported by your level of education, an inability to recall things, memory impairment, and other forms of executive functioning, making decisions independently and validly. So these are the cognitive functions.

And also in the differential diagnosis of this case, the presenting complaints as indicated by the patient, the neuropsychiatric testing, and the absence of any other comorbid disease like vascular dementia or Alzheimer's dementia, that would be responsible for the cognitive impairment. So based on differential diagnosis, her presenting complaints, the accumulative exposure to ECT was independent or significant or substantial.

Q. Okay. Do you recall what specific cognitive impairments Ms. O'Neil is -- is claiming she has now?

A. Well, my review of the report this morning, she had memory impairment. Even if she drives to a place she's not that familiar with, very well known, she gets lost. She had executive functioning deteriorated. She was -- I think she had a master's in laboratory science until she was

degenerative diseases. And based on the standards of factors, a history of exposure, a patient's testament of manifested symptoms are the criteria we use to make presumptive differential diagnosis within reasonable degree of medical certainty, not an absolute degree of medical certainty.

Q. Okay. So, Doctor, am I correct that your opinion is that the injuries that you are claiming Ms. O'Neil suffered in this case would not show up on an MRI or a CT scan? Is that correct?

A. Conventional. You need to qualify it. Conventional MRI/CT scans, no.

Q. Okay. Has she had any other scans other than conventional scans that you are aware of in this matter?

A. I don't think so. But there are no radiological tools that would show you cognitive impairment. None.

Q. Okay. You mentioned some neuro-psychological testing that you have reviewed of Ms. O'Neil. Do you recall that?

A. Yes, sir.

Q. Okay. And I think your report identifies

by itself, but the numbers and the repeated nature will remain a substantial and significant causal contributory factor or risk factor.

Q (By Mr. Viens) Doctor, in order to determine whether or not she had an aggravation of her cognitive impairment as a result of the ECT, wouldn't you need to know what her cognitive functioning was prior to ECT?

A. No, sir, because the patient -- a patient comes to you, "Sir, after I went to China, I came back. I began to notice I am having more episodes of headache than I used to have," well, that means temporally there was a novel -- a novel -- n-o-v-e-l -- novel event. This is -- what I am doing here is called differential diagnosis. That was a novel event. She traveled to China, came back. The headaches are worse.

You don't dismiss what that patient said just because she was having headaches in the past. No. Because of the concept of comorbidities, okay, then we investigate it. Okay? Now, maybe when she was in China she was exposed to Lyme disease. Okay? You cannot say, "Oh, the Lyme disease doesn't matter

because she was having headaches in the past." No. No.

And, especially, if the patient -- before anybody spoke to the patient, no lawyers spoke to the patient. These are the medical history. The patient tells a doctor, "Hey, I am having cognitive impairment, and it began or got worse during my ECT therapies. And after that, it's been progressive." The doctor wouldn't say, "Oh, Ms. O'Neil, you are lying. You are such a liar. Get out of my office." And we shouldn't do the same to her, no.

Q. So you would rely solely on what the patient is saying as to hearing what their symptoms were? You wouldn't go and look at what the documented medical records said about that?

MR. ESFANDIARI: Misstates testimony.

A. That's not what I said. That wasn't what I said.

MR. ESFANDIARI: Go ahead, David.

Q. (By Mr. Viens) Well, what is it -- my -- so you -- you have just testified that you would look at what the patient is saying and whether or not they are complaining of worse symptoms after a

particular event; am I correct?

A. No, sir, you are not correct. Sir, remember, this is a relationship between a patient and her physician. There was nobody -- no partner was involved. She wasn't -- she had not filed any lawsuit. This was independent and exclusive of what the hell we're doing today.

Sir, a patient tells a doctor while walking in, a woman with a master's degree, "Hey, I am having new symptoms." Okay? And then the good doctor, whomever it is, goes, checks the literature, his experience, and knows, okay, introducing electricity to a human brain multiple times, up to 20 times in a relatively short period of time is a substantial and significant risk factor. Sir, no matter what you do -- and that is why it's called differential diagnosis. You must include the history of the exposure.

Now, if she, like I have said before, she had only one or two, I would say I would want to see more exposures. I would not feel comfortable classifying one or two ECTs with a cognitive impairment.

Now, statistically speaking, just like in concussions, have there been patients who just received one concussion and that was it; they suffer irreversible brain damage? Yes. But is that the standard? Is that what majority of people will manifest? No.

Q. Doctor, on your report, you mentioned -- and you mentioned earlier there's a list of references at the last two pages? Pages 13 to 14, there are 19 references. Do you see that?

A. Yes, sir.

Q. Okay. And are those references that you relied on in forming your opinions in this case?

A. Sir, you have asked me this question earlier. And my answer was that, no, I relied, one, on my training, my education, my experience, and my knowledge. And also, over the years, I have read thousands and thousands of books and medical papers. So when I was writing this report, that was an amalgamation -- and I remember I used the word "amalgamation" -- of all this. And then why I put the references was for lawyers like you just to illustrate that these are not imaginary concepts.

If you notice, I even cited some textbooks. Okay? Do I have many more references? Yes, I do. Is it necessary? No.

For example, let me share something with you. When you are publishing a scientific paper in a journal, they actually limit the number of references you can put. They don't tell you, "No, don't list 500 references. Do just, in fact, 1 through 15."

So that's the simple principle here. I just give examples of papers. If -- if I need to give you more like I did in earlier -- there were some papers I cited to you that were not in my report -- I could do that.

Q. Okay. After you were retained --

MR. VIENS: Sorry. Did someone say something?

Q. (By Mr. Viens) Sorry. Strike that.

Doctor, after you were retained for the first time in a case involving injury alleging ECT, did you undertake any review of ECT literature concerning the risks or benefits of ECT?

A. Can you repeat the question again? Sorry.

C E R T I F I C A T E

I, Tina L. Hayes, a Licensed Shorthand Reporter and Notary Public of the State of New Hampshire, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes of the deposition of BENNET I. OMALU, M.D., who was duly sworn, taken on the date hereinbefore set forth.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

LICENSED COURT REPORTER TINA L. HAYES No. 80 SHORTHAND STATE OF NEW HAMPSHIRE

Tina L. Hayes, RPR, LCR