UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

DIANE O'NEIL, Case No.: 1:20-cv-175-PB

Plaintiff,

vs.

SOMATICS, LLC, et al.,

Defendants.

ALL REMOTE ZOOM VIDEOCONFERENCE

DEPOSITION OF BENNET OMALU, M.D.

(Volume II, Pages 126-159)

Date: Tuesday, October 24, 2023

Time: 10:29 a.m.

Location: Remote Proceeding - CA

ATKINSON-BAKER, A VERITEXT COMPANY

800.288.3376

AB JOB # 6139593

Q When did you speak to Miss O'Neil?
A Yesterday. 10:37:29
Q Tell me about that conversation, sir.
A I spent one hour with her in performing what we call a CLELKSHIP, C-L-E-L-K-S-H-I-P, CLELKSHIP.
Mainly physician/patient interaction. And I asked her questions: "Did it systematically heal?" She 10:37:58 told me how clinically she treat and her current symptoms where she's struggling with now. Difficulties. That was about it.
Q Did you make notes of that conversation, Doctor? 10:38:28
A No.
Q Did you record that conversation?
A No.
Q Who instigated the telephone call?
A It wasn't a telephone call. It was a Zoom meeting.
Q Okay. Who instigated -- who set up the Zoom 10:38:56 meeting?
A I request that for the meeting. When I do cases on living patients, I typically would like to meet with the patients, so I will tell the attorneys to set up a meeting. Sometimes I travel out to the patient, like I'm going to do in the coming week go to Newport Beach on another case of mine. Sometimes we do a Zoom meeting. 10:39:29

Q Are you a treating physician of Mrs. O'Neil?
A No.
Q Did you -- excuse me -- why did you take a clinical history of Miss O'Neil?
A I wouldn't -- I didn't say that. I did a CLELKSHIP, physician/patient interaction. It's my practice, the best practice is to interact with the patient. I have a feel of the patient just to confirm these are her symptomatologies, symptomatology. 10:39:59
Q Dr. Omalu, you are a pathologist, right?
A Yes, ma'am.
Q As a pathologist, is it your practice in treating patients or in dealing with patients for whom you are providing medical services to speak to the patient? 10:40:28
A Ha-ha-ha. Yes, ma'am. I'm -- in the State of California, our license says you're licensed physician on subject. So once the license is subject, then we have the right to treat if you want, and I write prescriptions. Just that I choose not to treat patients. So, yes, I interact with patients as a pathologist, yes. Ha-ha. 10:40:59
Q What did Mrs. O'Neil describe as her current symptoms to you?
A Well, Miss O'Neil in my interactions with her was an extremely college-educated woman. Her level of

said to me, "Do you know I come from Pittsburgh?" I was, "Oh, really. You grew up in Pittsburgh," and she said "Yes." And that's all I know about her. That's her private life. I don't know essentially where she lives or doesn't live. 11:09:58

Q Have you told me now everything that you and Mrs. O'Neil discussed yesterday? 11:10:22

A I'm thinking. I'm thinking. Socially our discussions were about symptoms, when they began, when she began to notice them. And she told me she was the one who actually stopped the ECT because she -- she believed that it was harming, causing harm to her. So she stopped it herself. And then after that, her symptoms began progressively, how she lost her job. She became emotional a lot of times. She told me about her suicide attempt. Is all -- I can't remember who, what was said, but it was all centered around her symptoms. We spent quite a long time on the behavioral impairment. Yeah. Essentially I told you what -- 11:10:57 11:11:26

Q What did she tell you about her suicide attempt?

A She says she committed suicide once with pills, and in the process changed her mind. Then she regurgitated the medicine. I don't think I asked her what medicine she took. And I said to her (indiscernible) she attempted suicide she said, no, no. 11:11:55

Q Did she tell you when this suicide attempt took place?
A No, we didn't go into such specifics, no.
Q Was there anything else that you and she talked about that we haven't discussed?
A We talked about her family, her husband her deceased husband, her sister, and her son. And, ha-ha, 11:12:26 I said to her, "Hey, you know, you're very good-looking woman." Ha-ha. She loved that. Oh, thank you, that really means a lot to me. She goes, you, too, you're very good looking. Ha-ha.
Q Doctor --
A (indiscernible), but that's unfortunate, you know. 11:12:55
Q Dr. Omalu, has this conversation with Mrs. O'Neil changed in any way the opinions that you expressed in the report that you wrote?
A It doesn't change my opinion. Just that it does concrete-ize my opinion that she's having more time with me, but maybe impairment, executive and intellectual impairment, behavioral impairment and then her mood 11:13:27 symptoms are progressive. Yeah, that -- my opinion hasn't changed, yeah.
Q Have you formulated an opinion as to whether the disease, Emery Dreifuss, that you discussed with me earlier was causally related to the ECT?

I, HOWARD SCHROEDER, C.S.R. #1123, a Certified Shorthand Reporter for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to computerized transcription under my direction and supervision. And I hereby certify that the foregoing transcript is a full, true and correct transcript of my shorthand notes so taken.

I further certify that I am not interested in the outcome of this action.

Witness my hand this 30th day of October 2023.

Howard Schroeder, CSR #1123
State of California

signature requested