**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JEFFREY THELEN,

Plaintiff,

v. Case No: 8:20-cv-1724-TPB-JSS

SOMATICS, LLC,

Defendant.
________________________ /

**ORDER ON *DAUBERT* MOTION AS TO GENERAL CAUSATION TESTIMONY BY BENNET OMALU, M.D.**

On May 26, 2023, this Court granted Defendant Somatics, LLC's motion to exclude general causation testimony by Bennet Omalu, M.D. *See* (Docs. 94; 209). This Order provides further detail and explanation for that ruling, supplementing the explanation the Court provided to the parties during the trial.

## Background

Plaintiff Jeffrey Thelen has suffered from severe depression and other mental health issues for many years, resulting in hospitalization on more than one occasion. From May 2014 to July 2016, he received over 90 electro-convulsive therapy ("ECT") treatments at a hospital in Omaha, Nebraska, using an ECT device manufactured and sold by Somatics. Thelen alleges that the ECT treatments caused permanent neurological injury, including permanent memory loss and brain damage.

On July 24, 2020, Plaintiff filed this product liability suit under various legal theories. In support of his claims, Plaintiff sought to offer expert testimony by Bennet Omalu, M.D., on the issue of general causation, i.e., whether ECT treatments can

cause brain damage, and specific causation, i.e., whether ECT treatments caused injury to Thelen. Somatics moved to exclude these opinions as inadmissible under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), and its progeny and Fed. R. Evid. 702. (Doc. 94). Plaintiff filed a response to the motion on January 12, 2023. (Doc. 115). After a supplemental production by Dr. Omalu and a brief deposition, Somatics filed a supplemental brief in support of its *Daubert* motion. (Doc. 133). The Court heard argument on the motion and testimony by Dr. Omalu on April 17, 2023. (Doc. 148).

On May 5, 2023, the Court entered an order denying Somatics' motion to exclude Dr. Omalu's specific causation testimony, but deferred ruling on the motion to the extent it sought to exclude his general causation testimony. (Doc. 170). The Court directed Thelen to file a supplemental submission of medical and scientific literature supporting Dr. Omalu's general causation opinion, which he did on May 15, 2023. (Doc. 198). Defendant filed a brief response. (Doc. 203). On May 26, 2023, the Court entered an endorsed order granting Somatics' *Daubert* motion with respect to general causation testimony by Dr. Omalu (Doc. 209), and then briefly explained the basis for its ruling in discussions with the parties during trial.

**<u>Legal Standard</u>**

An expert witness may testify in the form of an opinion if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the

facts of the case." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 597. "The party offering the expert testimony bears the burden of establishing, by a preponderance of the evidence, the expert's qualification, reliability, and helpfulness." *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942 (11th Cir. 2015) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

Functioning as a gatekeeper, the district court plays an important role by ensuring that all expert testimony is reliable and relevant. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). In *Daubert*, the Supreme Court articulated a non-exhaustive list of relevant factors to consider in fulfilling that role: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. *See Daubert,* 509 U.S. at 593-94; *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010).

Other relevant factors include whether the expert's testimony grows out of research the expert has conducted independently of the litigation, as opposed to having developed the opinions for the purpose of testifying, whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, whether the expert has adequately accounted for alternative explanations, and whether the expert has employed the same care and intellectual rigor in testifying as in his or her work outside of litigation. *See* Fed. R. Evid. 702, advisory committee notes (2000 amends.).



Omalu Ex O- 0003

The inquiry is a flexible one, focusing on the principles and methodology employed by the expert, not on the conclusions reached. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014); *see also Hanna v. Ward Mfg., Inc.,* 723 F. App'x 647, 649 (11th Cir. 2018) (outlining the criteria for the admissibility of expert witness testimony). At the same time, "'conclusions and methodology are not entirely distinct from one another,' and a court may 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Hendrix ex rel. G.P. v. Evenflo Co.,* 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)). *Daubert*'s reliability requirements apply to each step in the expert's analysis, and therefore any step that renders the analysis unreliable under *Daubert* renders the opinion inadmissible. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005).

## Analysis

### *Standards for General Causation Testimony*

A plaintiff seeking to establish the causation element of a products liability claim such as this one must present admissible expert testimony supporting both general causation and specific causation. *See, e.g.*, *Kilpatrick*, 613 F.3d at 1334 n.4; *McClain*, 401 F.3d at 1239. General causation refers to whether the product can cause the injury in question. *Kilpatrick*, 613 F.3d at 1334 n.4. Specific causation refers to whether the product did in fact cause the plaintiff's injury. *Id*. Specific causation is typically established by expert testimony employing a technique known as differential etiology (sometimes loosely referred to as "differential diagnosis"). *See Kilpatrick*, 613 F.3d at 1342-43; *Hendrix*, 609 F.3d at 1195 n.5. An expert employing this method first

"rules in" possible causes of the patient's condition (based on a general causation analysis), and then "rules out" other potential causes based on additional evidence, tests, or analysis, leading to a conclusion that the remaining possible cause more likely than not is the actual cause. *See Chapman*, 766 F.3d at 1310; *Kilpatrick*, 613 F.3d at 1332.

The Court allowed Dr. Omalu to testify as to specific causation. At issue here is Dr. Omalu's proposed general causation testimony that ECT is capable of causing brain damage. The primary methods for establishing general causation are analysis of epidemiological studies (to the extent they can be reliably applied to the facts of the particular case), analysis of the dose-response relationship, and examination of the background risk for the particular disease or condition. *See, e.g.*, *Chapman*, 766 F.3d at 1307-08. Secondary methods include the identification of plausible explanations for the mechanism of injury, generalized case reports, hypotheses, and animal studies. *Id*. These secondary methods do not by themselves provide proof of general causation. *See id*. at 1308.

***Dr. Omalu's Proposed Expert Testimony***

The Court assumes that Dr. Omalu, as a medical doctor and forensic pathologist whose particular field of expertise is brain injury, is generally qualified to offer an opinion on whether ECT causes brain damage. "Nevertheless, a 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method.'" *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (quoting *Clark v. Takata Corp.,* 192 F.3d 750, 759 n.5 (7th Cir.1999)). Thus, Dr. Omalu's general causation testimony cannot be admitted based

simply on broad assertions that his methodology is reliable, or that his opinions are founded on basic, well-accepted scientific principles, or are supported by the scientific literature, simply because he says that is the case. The reliability of an expert opinion cannot be established by the *ipse dixit* of the expert, no matter how qualified. *Frazier*, 387 F.3d at 1261. The Court is required to satisfy itself that Dr. Omalu's opinion on this issue is based on a scientifically valid methodology. *See Hendrix*, 609 F.3d at 1197.

The first problem with upholding the reliability of Dr. Omalu's general causation methodology under the standards set forth above is identifying what that methodology is. Although Dr. Omalu is board certified in epidemiology, he did not rely on epidemiological studies or principles to support his opinions. The closest he comes to addressing epidemiology in his deposition is a suggestion that epidemiology does not disprove a causal connection between ECT and brain damage. He does not discuss the concept of dose-response relationship, which is the relationship between the degree of exposure to an agent and the risk of disease. He states that he is not opining on how much electricity will cause brain injury in a single ECT treatment and that his opinions are limited to the cumulative effect of the over 90 treatments that Thelen received. But he identifies no threshold number of treatments required to produce the claimed injury.

Dr. Omalu repeatedly refers to his methodology as "differential diagnosis." As noted above, however, that technique addresses specific causation and involves ruling out possible causes. General causation addresses how the possible causes are "ruled in" in the first place, and cannot be established by differential diagnosis. *See, e.g.*,

*Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 599 n.55 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co.,* 609 F.3d 1183 (11th Cir. 2010) ("[D]ifferential etiology cannot be used to prove general causation; general causation must be established first.").

Dr. Omalu asserts that most of his opinions in this case are based on his education, training, and experience. But such general references, without more, are insufficient to establish the reliability of specific opinions. As the Eleventh Circuit observed in *Frazier*, 387 F.3d at 1261, quoting the advisory committee notes to Rule 702, an expert relying primarily on experience "'must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Dr. Omalu fails to do that here. Dr. Omalu has extensive clinical experience as a forensic pathologist with brain trauma but appears to have little experience with ECT in particular. He has not published on ECT, or conducted scientific studies on ECT, or autopsied patients to analyze the effects of ECT.

Nor does Dr. Omalu appear to have reached his opinions based on a systematic review or analysis of the medical literature. He acknowledges there are studies supporting both sides of the general causation question, but fails to explain his methodology for coming down on one side of this disputed issue. His expert report ends with a list of "References," but Dr. Omalu conceded that he did not rely on the cited literature in forming his opinions. He promised he would provide supporting articles following his deposition. Over a month later, he provided a list of 50 citations, almost none of which had appeared in his original report. It is therefore unclear

whether Dr. Omalu consulted any of these articles in forming his opinions, or whether they were chosen after-the-fact to support preexisting conclusions. *See, e.g., Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985) ("A scientist who has a formed an opinion as to the answer he is going to find before he even begins his research may be less objective than he needs to be in order to produce reliable scientific results."); *see also Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method.").

When defense counsel in deposition asked Dr. Omalu which of the cited articles support his opinion that ECT causes brain damage, he began reading the titles of the articles starting with the first one. He deflected questions about the specific content of the article by pointing out, as if to end the discussion, that the article had the word "morbidity" in the title. He then proceeded to read the titles of other articles in his list, with little explanation. Some of the articles were written in foreign languages Dr. Omalu does not know, and he admitted as to those articles that he had read only the abstract. This admission is troubling in light of his insistence elsewhere in the deposition that one cannot evaluate an article without reading the entire article or study in order to assess its methodology and reliability.

At bottom, Dr. Omalu's general causation opinion appears to rest on two propositions: (1) it is well accepted that the very purpose of ECT is to cause brain injury, and thereby induce a supposedly therapeutic seizure, and (2) the fact that ECT causes brain damage follows necessarily and obviously from basic scientific principles relating to brain injury.

Unwilling to accept Dr. Omalu's say-so on these matters, the Court directed Thelen to file copies of medical or scientific literature Dr. Omalu contended support his general causation opinions, with the relevant portions highlighted. Dr. Omalu then provided copies of 26 articles or other documents, many of which he had not cited previously. *See* (Doc. 198). This literature, individually and collectively, does not support Dr. Omalu's contention that it is well accepted that ECT is intended to cause brain injury or his contention that the fact that it causes such injury follows necessarily from basic principles of science. To the contrary, one of his cited articles acknowledges at the outset that governmental and scientific authorities have stated that ECT does not cause brain damage. *See* (Doc. 198-7). Evidence presented at trial demonstrated the same thing.

After reviewing the literature cited by Dr. Omalu and the record in this case, the Court concludes that the proposition that ECT as currently practiced causes brain damage in human patients is a debated point to be evaluated based on studies, experiments, and other evidence. The matter is not as simple and settled as Dr. Omalu posits, even if individual statements in the literature might lend support to his ultimate conclusions. Choosing one side of the existing medical and scientific literature on a contested point, and citing one's education, training, and experience as the basis for the choice, is not sufficient to demonstrate the admissibility of a general

causation opinion.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 12th day of June, 2023.

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**