**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

DIANE O'NEIL,

*Plaintiff*,

v.

SOMATICS, LLC; and ELEKTRIKA, INC.,

*Defendants,*

Case No.: 1:20-cv-00175-PB

District Judge: Honorable Paul J. Barbadoro

Magistrate Judge: Honorable Andrea K. Johnstone

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF BENNETT OMALU, M.D.**

## INTRODUCTION

In its motion, Defendant has taken Dr. Omalu's qualifications, opinions, the bases for them, and his deposition testimony out of context and mischaracterized them to the point of unrecognizability. Dr. Omalu is preeminent in his field, and his opinions and the bases for those opinions are reliable, well-supported, and will assist the trier of fact in determining the scientific issues in this case – specifically, whether Somatics' ECT device is capable of causing brain injury and whether O'Neil suffered brain injury as a result of undergoing ECT treatment.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that expert opinion testimony is admissible if (1) the witness is qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702;

*see Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993); *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F. 3d 77, 80 (1st Cir. 1998).

In assessing the reliability of scientific expert testimony, the Court may consider several different non-exclusive Daubert factors and has broad discretion. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145 (1999). District courts are granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. "As with all other admissible evidence, expert testimony is subject to being tested by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596; *see also Ruiz–Troche*, 161 F. 3d at 80–81 ("As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process ... rather than excluded from jurors' scrutiny"); *Milward v. Acuity Specialty Prods. Grp., Inc*., 639 F.3d 11, 14 (1st Cir. 2011) (same). "Although the proponent of an expert witness bears the burden of proving the admissibility of his opinion, the burden is not especially onerous, because 'Rule 702 has been interpreted liberally in favor of the admission of expert testimony.'" *Fitzmorris et al. v. N.H. Dep't of Health and Human Services Comm'r Lori Weaver et al.,* 2023 WL 8188770, *11 (D.N.H. 2023) (*quoting Lacaillade v. Loignon Champ-Carr, Inc.,* 2011 WL 6001792, *1 (D.N.H. Nov. 30, 2011) and *Levin v. Dalva Bros, Inc.*, 459 F.3d 68, 78 (1st Cir. 2006)).

## ARGUMENT

### I. Dr. Omalu is Eminently Qualified

Dr. Bennet Omalu is a medical doctor, forensic pathologist and neuropathologist who was the first to discover and publish findings on chronic traumatic encephalopathy (CTE) in American football players. Ex. 1 to Esfandiari Decl., Omalu CV. He is a professor at the

University of California, Davis in the department of medical pathology and laboratory medicine. *Id.* He has been co-director of the Brain Injury Division at the Rockefeller Institute of Neuroscience. *Id.* He is board certified in Anatomic Pathology, Clinical Pathology, Forensic Pathology, and Neuropathology[1] and has a master's degree in public health and epidemiology from the University of Pittsburgh. *Id.* He is licensed to practice medicine in several states and he has previously been permitted to testify concerning electrical injuries. *Id.*[2]

Dr. Omalu has administered ECT and observed numerous ECT sessions. Ex. 2A, Omalu Dep., Vol. I, at 13:11-14:11, 16:7-16, 18:4-10. Dr. Omalu is well versed in ECT science, he was educated in ECT, and part of that education included the risk of brain damage. *Id*. at 14:2-11, 25:8-26:6. Dr. Omalu has performed autopsies on patients who have received ECT and observed changes in their brains (although the purpose of the autopsies was not to determine whether ECT caused the changes). Ex. 2C, Omalu Dep. Vol. III at 31:17-32:24.

Dr. Omalu is one of the foremost experts on the anatomy and function of the brain and brain injury in the United States and has applied his extensive knowledge and experience to the facts of this case, he explained his general causation opinions and the bases for them in his report, with references to scientific literature, which he later supplemented, and relied on the research and opinions of other highly qualified experts in their respective fields. Omalu Decl. ¶¶ 9-11, Report; Ex. 3, Supplemental list of literature; Omalu Decl. ¶ 2.

---

[1] "Pathology is devoted to the study of the structural, biochemical, and functional changes in cells, tissues, and organs that underlie disease. By the use of molecular, microbiologic, immunologic, and morphologic techniques, pathology attempts to explain the whys and wherefores of the signs and symptoms manifested by patients while providing a rational basis for clinical care and therapy. It thus serves as the bridge between the basic sciences and clinical medicine, and is the scientific foundation for all of medicine." Ex. 4, Robbins et al., PATHOLOGIC BASIS OF DISEASE.

[2] *Garcia v. Cnty. of Riverside*, 2019 WL 4282903, at *16 (C.D. Cal. June 7, 2019) (as a forensic pathologist and a Clinical Professor with particular expertise in cerebral injuries, Dr. Omalu has the necessary qualifications to analyze the effects of a taser on Decedent).

Incredibly, Somatics argues Dr. Omalu "is not qualified to opine about what happens to the human brain when ECT is administered." Dft. Mot. at 3. Specifically, Somatics argues Dr. Omalu is not qualified because he does not currently treat or diagnose living patients[3] and he purportedly has "no expertise in ECT." Dft. Mot. at 9-10. Although Plaintiff disputes Somatics' characterizations, neither argument is a sufficient basis to exclude his opinions. *See U.S. v. Mahone*, 453 F. 3d 68, 71 (1st Cir. 2006), *citing United States v. Rose*, 731 F.2d 1337, 1346 (8th Cir. 1984) (holding, pre-*Daubert*, that "[a]n expert witness need not be an outstanding practitioner in the field nor have certificates of training in the particular subject"). It is well established that "Rule 702 does not require specific educational training in the area of expertise … and experience with the particular product in order to render opinion …." *Warford v. Industrial Power Systems* 553 F. Supp. 2d 28, 32 (D.N.H. 2008) (*citing Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 958 F. 2d 1169, 1175 (1st Cir. 1992)); *see also DaSilva v. American Brands, Inc.* 845 F. 2d 356, 361 (1st Cir. 1988) ("Appellant, in essence, is arguing that we should constrain a trial court to admit testimony only from mechanical engineers who have had design experience with the specific machine in question. Such an approach would often mean that the only expert who could testify regarding a machine are those who have an interest in defending its design."); *Payton v. Abbott Labs*, 780 F.2d 147, 155 (1st Cir. 1985) ("The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it.").

## II. Dr. Omalu's Opinions are Reliable and Will Assist the Trier of Fact in Understanding the Evidence

[3] Dr. Omalu practiced medicine as a general practitioner for five years prior to focusing on pathology. Ex. 2A, Omalu Dep., Vol. I, 7:16-8:7. In his professional practice, Omalu intermittently meets and clinically evaluates patients who have suffered all forms of brain trauma and performs differential diagnosis to determine causation, sometimes including CTE patients, in and outside of sports. Omalu Decl., ¶ 13.

It is Dr. Omalu's opinion that ECT causes brain injury and brain damage; he intends to testify concerning the mechanisms through which ECT causes brain injury, the manifestations of brain injury, and that O'Neil suffered brain damage resulting from ECT. In formulating his opinions, Dr. Omalu took the totality of his previous education, training, experience, and the knowledge gained from studying the literature, including the literature cited in his report and a supplemental list of references provided to Somatics (Ex. 3), and he applied it to this case. Omalu Decl. ¶ 2. The list of Dr. Omalu's original and supplemental references consists of articles collected over his 30-year career and stored in his Medical Literature EndNote archive. Contrary to Somatics' representations, he has testified that he has read the literature, and he relied on it, his experience, and much more, in forming his opinions. Ex. 2A, Omalu Dep., Vol. I, 19:3-8, 35:17-38:1, 67:13-68:9, 76:8-22; 115:7-116:14, 117:2-16.[4] Omalu Decl. ¶ 6. Dr. Omalu explained in a previous case (with the same general causation opinion and references):

> Q. How did you compile the articles that made up this list?
>
> A. … **Over the decades** – I've been practicing now over 30 years – **I've read textbooks, published literature, articles. And many of the articles across the years I read, I save quite a number of them in an EndNote, E-N-D-N-O-T-E.** EndNote is the most popular software doctors and scientists use to archive published literature. So there are thousands and thousands of published articles in – in my EndNote libraries across different subjects … **I formulate opinions not based on one single article I have read, but the entirety of the articles I have read in my career, my experience, my knowledge, my training. So whenever somebody asks me to give an example of an article – I don't memorize articles in my head, I wish I could – so what I do, I go back to my literature library. I select – I can give you 2-, 3-, 400, 500 papers. That wouldn't be rational. So I try my best to select what I can. And then I go back to the library just to do a quick review to see if anything has really changed from what I know and if there are any recent articles that have interest to me. So the list you have I did not compile just because of this case.** This is what I do for every case given my decades of experience, training, and knowledge.

Ex. 2E, Omalu Dep. in *Thelen v. Somatics*, Vol. III at 173:20-175:3, emphasis added.

---

[4] Somatics has grossly mischaracterized Dr. Omalu's testimony by inserting a false narrative in brackets ("Is it [relying on medical literature] necessary? No." Somatics Motion at 4. In truth, Dr. Omalu testified that it was not necessary to list everything on which he relied in his report, not that relying on literature was not necessary.

Somatics argues Dr. Omalu's opinion as to whether ECT is capable of causing brain injury is unreliable and irrelevant. As Dr. Omalu explains, however, his opinions are well supported by generally accepted principles of medicine and science. A seizure itself is the manifestation of brain trauma. Indeed, "[t]he idea that ECT causes brain damage was so obvious to the early proponents [of ECT] that they incorporated it into an explanation for how ECT worked." Ex. 5, Read, *Shocked – With evidence for efficacy so thin, and the stakes so high, why is 'electroshock' therapy still a mainstay of psychiatry?* Aeon, March 4, 2021. *See also* Ex. 6, Alpers; Ex. 7, Allen; Ex. 8, Freeman; Ex. 9, Sterling; *see also* Cleveland Clinic ("Seizures happen when a malfunction causes neurons to fire electrical signals uncontrollably. That causes a domino effect, meaning more and more neurons go haywire. The more malfunctioning neurons, the greater the effect of the seizure. If these malfunctions happen often enough, it can affect how your brain cells work … If they keep happening … these electrical malfunctions will damage and destroy your brain cells. When this happens to enough neurons in a part of your brain, the result could be permanent brain damage."[5]

Notably, during a 2019 Traumatic Brain Injury Advisory Board meeting at the Department of Rehabilitation, in Sacramento, California, prior to having any involvement in ECT litigation, Dr. Omalu responded to a public comment as follows:

> Member of the public, Sarah Price Hancock mentioned that people with a history of electroconvulsive therapy aren't routinely given comprehensive brain injury assessments and have difficulty accessing assessments and rehabilitation for brain injury when needed. Further exploration into the needs of those impacted by ECT and other functional injuries is needed. Dr. Bennett Omalu confirmed repetitive head trauma causing functional injuries are not readily seen on standard scans. (including mechanisms of trauma that are sports related, domestic violence, shaken baby syndrome, electrical exposure, repeated toxic exposure, anoxia (oxygen deprived) etc.). Dr. Omalu also confirmed that neuropathology of electrical injury as well as the neuropathology of people with a history of electroconvulsive therapy is well recognized as causing extensive functional changes to brain activity and

[5] https://my.clevelandclinic.org/health/diseases/22789-seizure

> should be considered in the context of both electrical injury and repetitive electrical trauma to the head because natural laws governing electricity aren't changed based on the intent of medical administration.

Ex. 10, August 26, 2019, Traumatic Brain Injury Advisory Board Meeting Minutes. Thus, Dr. Omalu was voicing his opinion concerning the risks of ECT, at a formal meeting amongst his physician colleagues, before ever becoming involved in ECT litigation.

**A. Dr. Omalu's Reliance on Dr. Kenneth Castleman**

Somatics states that, for the basis of his theories about the neuropsychological effects of ECT, Dr. Omalu relies on the "untested and unsupported conclusions of Dr. Kenneth Castleman." Dft. Mot. at 6. To be clear, the totality of Dr. Omalu's reliance on Dr. Castleman is explained in his report as follows:

> As Kenneth R. Castleman's report has illustrated, the modern ECT machine generates electrical energy and delivers and transmits electrical current into the human head and brain in short pulses, as short as one millisecond, separated by longer periods during which the current is not flowing. The amount of electricity delivered to the patient's head and brain by an ECT machine can be measured in joules or in coulombs. Modern ECT machines can deliver 100 joules of energy or one-half coulomb of charge in the United States and 200 joules and one coulomb in Europe and Asia. They are constant-current pulse generators that can automatically and continuously adjust the voltage, as necessary, to maintain the current at a specified level. The dose may be delivered at a pulse frequency of 70 Hertz [70 positive and 70 negative pulses every second, delivered in alternation] for a period of 7.2 seconds for a total of 1008 pulses. Each pulse is 0.3 milliseconds in duration with 6.84 milliseconds of dead time where the current is not flowing between pulses. The pulse frequency can be set between 10 and 70 cycles per second and the pulse can be as brief as 0.3 milliseconds. The current is typically set at 0.9 amps and thus the brain is subjected to over a thousand alternating positive and negative current pulses of almost one amp each.
>
> According to Dr. Castleman's report, voltage equals current times resistance according to Ohm's law. The resistance of the patient's head varies and ranges from 1,440 ohms to 260 ohms prior to and during treatment, respectively. The voltage therefore can be in the range of 230 volts and can go up to 460 volts as needed to overcome the patient's resistance.
>
> The fundamental unit and foundation of electrical signaling and functioning of the human brain and nervous system is the action potential [AP], which is created by electrogenic Sodium-Potassium [Na+-K+] membrane ionic pumps/ channels. The resting membrane potential of the human brain cell and membrane is -90mV and the generation of an AP from this resting membrane potential to depolarization at about +10 mV lasts only few 10,000th of a second [1/10,000 seconds] for the activation and inactivation of the sodium membrane channels. For a single ECT

> treatment the dose is delivered at about 1000 pulses at up to 460 volts per pulse. This results in 460,000 volts, which is 5 million times the resting membrane potential of a human brain cell and membrane. While the activation and generation of an AP lasts only few 10,000th of a second, the duration of each pulse of the ECT machine is about 0.3 milliseconds, with up to 70 pulses per second for up to 7.2 seconds, which is a duration that is about 70,000 times the duration of an AP.

*See* Omalu Decl., Report at 9-10. Dr. Omalu, in turn, concludes in his report:

> Any factor that undermines, impairs, and alters the delicate physiological and biochemical homeostatic milieu of the human brain has a significant potential to cause brain injury and damage, if adequately sustained and persistent. The amounts of electrical energy introduced to the human brain by ECT machines can be nothing but harmful and dangerous. These amounts of energy are exponentially outside the tolerable homeostatic ranges and thresholds of the human brain and nervous system and will no doubt, and are in fact expected to cause cellular physiologic, biochemical, and anatomic injuries to the human brain cells. Since the human brain is post-mitotic and cannot completely regenerate itself following such injuries, and since such ECT-induced electrical injuries occur repeatedly over time, the patient who receives ECT therapy will manifest permanent and cumulative brain injury, which can be progressive over time and result in chronic encephalopathies and brain degeneration. Such brain degeneration can manifest with multi-domain neurological impairments including cognitive impairment, mood disorders and neuro-psychiatric impairment, behavioral impairment, motor disorders and other somatic symptoms and signs.

*See* Omalu Report at 9-10. First, Dr. Castleman's opinions concerning basic principles of electricity and mechanisms in the administration of ECT are non-controversial.[6] Further, experts are permitted to rely on the opinions of colleagues so long as they employed reliable methodologies in forming their opinions. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997). As the Supreme Court explained in *Daubert*: "Unlike an ordinary witness, an expert is permitted

---

[6] Again, Somatics misrepresents Dr. Omalu's opinions. Dft. Mot. at 6. Contrary to Somatics' statements, Dr. Omalu *does not* rely on Dr. Castleman for his opinion that ECT replaced chemicals to induce seizures (a fact that is not even debatable), that the objective of ECT is to inflict brain injury, or that O'Neil's 22 ECT treatments caused her cognitive impairment. Dr. Omalu relied on Dr. Castleman's opinion only concerning the amount and form of electricity generated by the ECT machine. Dr. Omalu testified that he does not even rely on Dr. Castleman concerning the amount of electricity that reaches the brain because the amount of electricity that reaches the brain is sufficient to induce a seizure. Ex. 2A, Omalu Dep. Vol. 1, 62:4-63:11. Dr. Omalu explained that ECT's mechanism of action is to induce a seizure and seizure is a manifestation of brain injury, and he identified numerous articles during his deposition in support. Ex. 2A, Omalu Dep. Vol. 1, 42:16-44:21, 62:21-63:11. Ex. 2A; see also Ex. 2C, Omalu Dep. Vol. III, p 57:2-14 (when asked for an article stating ECT is done intentionally to cause brain injury, Dr. Omalu provided one and testified "I don't think any human being intentionally causes brain damage. That is not a good way to phrase it … It's like when we give a patient drugs for cancer, we know those drugs damage the body, but it's not intentional.").

wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (internal citations omitted). Experts may base their opinions on inferences properly drawn from scientific facts. *Id.* (applying the term "knowledge" to "any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."). Indeed, "trained experts commonly extrapolate from existing data," so long as they "explain how and why" they extrapolated the data. *Joiner*, 522 U.S. at 144–46.

**B. Dr. Omalu's Mechanism of Injury**

Somatics also takes issue with Dr. Omalu's opinion concerning ECT's mechanism of injury. Dft. Mot. at 6-7. Specifically, Somatics challenges his opinions concerning electrical excitation, accumulation of abnormal proteins, cell death and neurodegeneration, and his reference to other modalities of brain injury such as thermal and kinetic energy and hypo-toxic-eschemic injury. However, Dr. Omalu has identified articles and texts supporting his opinions. *See e.g*., Ex. 34 Guyton; Ex. 6, Alpers; Ex. 35, Friedberg; Ex. 36, Love; Ex. 37, Love; Ex. 38, Pelletier; Ex. 39, Zarubenko. *See also* Ex. 2A, Omalu Dep., Vol. I, 74:4-78:14; 79:4-80:3.

**C. The Scientific Literature Supports Dr. Omalu's Opinions**

While practitioners of ECT, understandably, are advocates of the procedure and have published articles and textbooks denying that ECT causes brain damage, permanent memory loss, and cognitive dysfunction, which Dr. Omalu acknowledges, there exists a plethora of reliable scientific evidence that supports Dr. Omalu's opinions, not to mention Plaintiff's other experts. *See e.g.,* Read Decl., Report, citing multiple studies, including Read's own; Ex. 11, *Read et al., Read Electroconvulsive Therapy for Depression: A Review of the Quality of ECT versus Sham ECT Trials and Meta-Analyses*, 21 ETHICAL HUMAN PSYCHOLOGY AND PSYCHIATRY 64 (2019); Ex. 12, Sackeim et al., *The Cognitive Effects of Electroconvulsive*

*Therapy in Community Settings*, NEUROPSYCHOPHARMACOLOGY (2007) ("A series of recent studies demonstrates that retrograde amnesia is persistent … It has also become clear … retrograde amnesia due to ECT can be profound, with the memory loss extending back years prior to receipt of the treatment."); *See also* Exs. 13-27.

While Somatics (and the ECT community) have failed to conduct well designed placebo controlled clinical trials to test the efficacy and safety of ECT (Ex. 28, Abrams Dep. at 81:15-20, 154:11-14; Arrowsmith Decl., Report at 13, 23), it is generally accepted that ECT causes memory loss, cognitive impairment, and brain damage—what is unknown, due to Somatics' failure to test, is the full extent to which these adverse outcomes occur. Read Decl., Report; Ex. 12, Sackeim; Ex. 29, Somatics' 2019 "Regulatory Update"( "ECT may result in anterograde or retrograde amnesia" and "in rare cases, patients may experience permanent memory loss or permanent brain damage"); Ex. 30, World Health Organization and United Nations High Commissioner for Human Rights joint guidance, *Mental health, human rights and legislation: guidance and practice* (2023) (noting that "significant controversy" surrounds ECT and stating: "If permitted, ECT must only be administered with the written or documented, free and informed consent of the person concerned" and those offered ECT should be "made aware of all its risks and potential short- and long-term harmful effects, such as memory loss and brain damage." Nonetheless, the subject of an expert's testimony need not be **known to a certainty** for that testimony to be admissible. *Daubert*, 509 U.S. at 590. To be admissible, the testimony must take **what is known**, however large or small that body of knowledge may be and draw conclusions from that knowledge using the scientific method. *Id.* Dr. Omalu has done that.

**D. The District Court's Decision to Limit Dr. Omalu's General Causation Opinion in *Thelen v. Somatics* Was Erroneous**

Somatics cites the District Court's exclusion of Dr. Omalu's general causation opinion in

*Thelen v. Somatics*. 8:20-cv:01724-TPB-JSS (M.D. Fla. June 12, 2023). Plaintiff respectfully submits that the court in *Thelen* was simply factually and legally wrong in limiting Dr. Omalu's opinion, and that the court's decision was primarily based on a desire to limit the duration of trial.[7] Importantly, the court did allow Dr. Omalu to testify concerning specific causation.

In its order, the Court in *Thelen* held "[a]lthough Dr. Omalu is board certified in epidemiology, he did not rely on epidemiological studies or principles to support his opinions." *Thelen* Order at 6. However, epidemiological evidence is not required to prove causation, either in the Eleventh Circuit or First Circuit. *See Rider v. Sandoz Pharmaceutical*, 295 F. 3d 1194, 1199 (11th Cir. 2002); *Milward v. Acuity Specialty Products Group*, 639 F. 3d 11, 24 (1st Cir. 2010) ("It is well-settled that while epidemiological studies may be powerful evidence of causation, the lack thereof is not fatal to a plaintiff's case." This is particularly true since no epidemiological studies exist concerning brain damage per se.[8]

The Court in *Thelen* stated Dr. Omalu did not discuss the concept of dose-response relationship…" *Thelen* Order at 6. However, Dr. Omalu *did* discuss dose response and cited supporting literature. Ex. 2D, Omalu Dep. in *Thelen* Vol. II at 105:9-13; *see also* Omalu Report at 9. While there is no literature that identifies a particular threshold for injury, Dr. Omalu cited literature that showed a dose response. *See* Ex. 31, Dubey; Ex. 32, Fink; and Ex. 33, Jasper's. The Court further stated that "Dr. Omalu asserts that most of his opinions in this case are based

[7] The court's order limiting Dr. Omalu's general causation opinion will be raised in Thelen's pending appeal.

[8] When asked to identify an epidemiological study that says ECT is a risk factor for brain damage, Dr. Omalu identified an article by Sackheim, *The Cognitive Effects of Electroconvulsive Therapy in Community Settings* which found: "Of the 306 patients classified, 12.43 percent patients met the a priori criteria for having marked and persistent retrograde amnesia … It has also become clear … retrograde amnesia due to ECT can be profound, with the memory loss extending back years prior to receipt of the treatment." Ex. 12, Sackeim; Ex. 2C, Omalu Dep. Vol. III, p. 28:3-25. Based on Dr. Omalu's expertise, this is evidence of brain damage.

on his education, training and experience. But such general references, without more, are insufficient to establish the reliability of specific opinions." *Thelen* Order at 7. But there *was* more, as evidenced in the literature cited in his initial report, in the scores of additional articles and textbooks provided to Somatics and the Court, his testimony about the literature he has reviewed over the course of his career, and Dr. Omalu's reliance on Dr. Read and Dr. Castleman.

The Court in *Thelen* also questioned Dr. Omalu's experience. *Thelen* Order at 2. Relying upon the opinions of Plaintiff's other experts as well as his own extensive knowledge of the workings of the human brain and brain trauma, including the "fundamental and foundation of electrical signaling and functioning of the human brain and nervous system" in its normal state (*citing* Guyton & Hall textbook of Medical Physiology, Ex. 34), Dr. Omalu concluded that ECT's "amounts of energy are exponentially outside the tolerable homeostatic ranges and thresholds of the human brain and nervous system" and "are expected to cause cellular physiologic, biochemical and anatomic injures to the human brain cells." Omalu Decl., Report at 10. Dr. Omalu supported his opinions with scientific literature. *Id*. at 16; Ex. 3; Exs. 4-27, 31-39; Ex. 2E, Omalu Dep. in *Thelen* Vol. III at 173:20-175:3 (explaining his review of the medical and scientific literature over the years).

The Court stated that Dr. Omalu "has not published on ECT, or conducted scientific studies on ECT, or autopsied patients to analyze the effects of ECT" and did not conduct a systematic review of the literature. *Thelen* Order at 7. *First*, Dr. Omalu *did* rely on Dr. Read who conducted a systematic literature review, as is Dr. Read's particular area of expertise. *Second*, neither *Daubert* nor its progeny stand for the proposition that an expert must have conducted scientific studies or undertaken a systematic review of the literature. Experts may rely on "legitimate, preexisting research unrelated to the litigation" which "provides the most

persuasive basis for concluding that the opinions expressed were 'derived by the scientific method'" *Monroe v. Zimmer U.S. Inc*., 766 F. Supp. 2d 1012, 1028 (E.D. Cal. 2011); *Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir.1994) (expert's testimony based on thirty years of experience and his review of records and literature was "'ground[ed] in the methods and procedures of science' and was not mere 'unsupported speculation.'"); *Walker v. Soo Line R.R*., 208 F.3d 581, 588 (7th Cir. 2000) ("Medical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions."); *In re James Wilson Assocs*., 965 F. 2d 160, 172 (7th Cir.1992) ("An expert is of course permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him …").

The Court in *Thelen* stated that, while Dr. Omalu acknowledged views contrary to his own, he did not explain why he came down on the side of ECT causing brain damage. Again, no such requirement exists. To be admissible, Dr. Omalu was not required to show whether ECT causes brain damage is a settled issue. *Daubert,* 509 U.S at 590; *see also*, *Loewen v. Wyeth*, 2011 WL 6942887, 3 (N.D. Ala. Nov. 14, 2011) (expert is "not required to show unanimity in science"); *Jones v. Otis Elevator Co*. 861 F. 2d 655, 662 (11th Cir. 1988).

The Court also erroneously stated that "Dr. Omalu conceded he did not rely on the cited literature in forming his opinions." *Thelen* Order at 7. But Dr. Omalu testified he relied on thousands of papers and textbooks.

In sum, Dr. Omalu identified numerous scientifically reliable articles and textbooks that support his opinions and illustrate ECT can cause brain injury and cognitive impairment. *See* Omalu Decl., Report at 16; Ex. 3; Exs. 4-27, 31-39, articles and textbooks on which Omalu read and relied; Ex. 2A, Omalu Dep. Vol. I, p. 43:11-44:21, 46:8-53:13, 67:13-68:9, 115:7-117:16.

The court's order limiting Dr. Omalu's general causation testimony was erroneous and inconsistent with both Eleventh Circuit and First Circuit law.

**E. Dr. Omalu's Differential Diagnosis**

Dr. Omalu reliably applied differential etiology in concluding ECT was a significant and substantial factor in causing O'Neil's memory loss, cognitive dysfunction, and brain injury. Dr. Omalu reviewed the available medical records, including reports of O'Neil's neuropsychological testing, O'Neil's deposition transcript, and the expert reports of Kenneth Castleman, John Read, and Richard Perillo. Omalu Decl. ¶ 16, Report at 3. He provided a medical summary pre-ECT, during ECT, and post-ECT. *Id.* at 3-6.

Based on his review of the above referenced material, and conducting a differential diagnosis, Dr. Omalu concluded "ECT was a significant and substantial causal contributory factor to Diane O'Neil's brain injury and cognitive impairment." Omalu Decl., ¶ 16, Report at 12. Dr. Omalu explained during his deposition the bases for his opinions, what he considered (ruled-in) and why he ruled out alternative causes. Ex. 2A, Omalu Dep. Vol. I, 86:2-95:12, 98:5-100:17, 105:22-114:18; Ex. 2B, Omalu Dep., Vol. II, 151:23-152:11; Ex. 2C, Omalu Dep., Vol. III, 9:2-11:20, 14:21-15:25;18:10-17, 24:12-25:7, 50:24-51:25, 53:4-7, 63:16-22, 71:4-75:20. *See also* Omalu Decl. ¶¶ 16-23 (Dr. Omalu considered depression, O'Neil's traumatic life history, any brain tumors, brain trauma, intracranial pathology or diseases, vascular dementia, Alzheimer's dementia, blunt force trauma, alcoholism, anesthesia, loss of oxygen, medications, and Emery Dreifuss disease as potential alternative causes.)

Dr. Omalu did not see any forensically significant or substantial cognitive impairment in the medical records prior to O'Neil's ECT treatments and has stated that not all patients with depression suffer cognitive impairment. Omalu Decl. ¶ 23. He concludes: "Although Ms.

O'Neil had some transient problems with concentration, ability to focus, and work due to depression, it is much more plausible, particularly given the degree of Ms. O'Neil's current and chronic cognitive impairment, that her exposure to ECT (which is a known risk factor) was a significant and substantial causative factor in her ongoing impairment." Omalu Decl., ¶ 29.

To the extent Somatics suggests Dr. Omalu's opinions are unreliable because he did not physically examine Diane O'Neil himself, courts have routinely rejected such arguments. *Haller v. AstraZeneca Pharm. LP*, 598 F. Supp. 2d 1271, 1294–95 (M.D. Fla. 2009); *Giladi v. Strauch*, 2007 WL 415365, at *9 (S.D.N.Y. Feb. 6, 2007) (medical expert's opinions "are not mere ipse dixit pronouncements" because they are based upon review of medical records and "extensive experience as an orthopedic and hand surgeon"); *Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir.1994) (expert's testimony based on thirty years of experience and his review of records and published materials was "'ground[ed] in the methods and procedures of science' and was not mere 'unsupported speculation.'" Notwithstanding, Dr. Omalu interviewed O'Neil over Zoom and has provided testimony concerning this interview. Ex. 2B, Omalu Dep. Vol. II, 132:23-137:5, 150:6-19, 151:4-7.

**CONCLUSION**

Well-known and basic principles of science and scientific literature support Dr. Omalu's opinion that injury is occurring from ECT and is manifesting in the form of, at a minimum, grand mal seizures, and, as any neuropsychologist would recognize, in cognitive dysfunction and memory loss. Ex. 9, Sterling, *ECT Damage is easy to find if you look for it*, NATURE, Vol 403 20 January 2000. For the foregoing reasons, Defendant's motion to exclude the expert opinion and testimony of Dr. Omalu should be denied.

Respectfully submitted,

Dated: January 5, 2024

*/s/ Bijan Esfandiari*
Bijan Esfandiari, Esq. (*Pro Hac Vice Admitted*)
besfandiari@wisnerbaum.com
Monique Alarcon, Esq. (*Pro Hac Vice Admitted*)
malarcon@wisnerbaum.com
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Tel: (310) 207-3233
Fax: (310) 820-7444

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I, Bijan Esfandiari, hereby certify that on this date, January 5, 2024, the foregoing was filed electronically via the Court's CM/ECF system, to be served on all counsel of record by operation of the Court's electronic filing system.

*/s/ Bijan Esfandiari*
Bijan Esfandiari